CC-96-2                                    - 1 -

En el Tribunal Supremo de Puerto Rico


| El Pueblo de Puerto Rico | |
| --- | --- |
| Peticionario | Certiorari |
| V. | |
| Santiago Ferreira Morales Santiago Ferreira Ortiz | 98TSPR165 |
| Recurridos | |


Número del Caso: CC-96-136

Abogados de la Parte Peticionaria: Hon. Carlos Lugo Fiol
Procurador General

Lic. Marta Maldonado Maldonado
Procuradora General Auxiliar

Abogados de la Parte Recurrida: Lic. Robert A. Lynch González

Abogados de la Parte Interventora:

Tribunal de Instancia: Superior, Sala de Caguas Subsección de Distrito

Juez del Tribunal de Primera Instancia: Hon. Rubén Torres Dávila

Tribunal de circuito de Apelaciones: Circuito Regional VI, Caguas,
Humacao y Guayama – Panel 1

Juez Ponente: Hon. Amadeo Murga

Fecha: 12/10/1998

Materia:


Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correciones del
proceso de compilación y publicación oficial de las
decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

      v.                   CC-96-136         Certiorari

Santiago Ferreira Morales y
Santiago Ferreira Ortiz

    Recurridos

**Opinión del Tribunal emitida por el Juez
Asociado señor Hernández Denton**

San Juan, Puerto Rico a 10 de diciembre de 1998.

El Ministerio Público nos solicita que revoquemos una decisión del extinto Tribunal de Distrito, Sala de Caguas, mediante la cual se suprimió cierta evidencia delictiva incautada por miembros de la División de Vehículos Hurtados de la Policía de Puerto Rico en el depósito de chatarra conocido como "El Capitán". La incautación fue realizada durante un registro realizado por la Policía en dicho lugar sin la previa obtención de una orden judicial basada en causa probable y sin que existieran motivos fundados para creer que en el lugar intervenido se hubiera cometido un delito. El Tribunal de Circuito de Apelaciones confirmó al foro

de instancia por entender que la intervención fue irrazonable.

En su recurso ante nos, el Ministerio Público aduce que la intervención realizada en el depósito de chatarra constituyó un registro administrativo de un negocio estrechamente reglamentado, por lo que la Policía de Puerto Rico no estaba compelida a obtener una orden judicial como condición para realizarlo. Resolvemos que a tenor con la Ley Núm. 125 de 27 de junio de 1966, según enmendada, los depósitos de chatarra son negocios reglamentados estrechamente por el Estado. Por ello, la Policía de Puerto Rico puede realizar válidamente registros administrativos en ellos sin la previa obtención de una orden judicial sujeto a que se satisfagan los criterios que exponemos.

Sin embargo, devolvemos el caso de autos al foro de instancia para que a la luz de los pronunciamientos expuestos en esta Opinión determine si la intervención específica de la Policía en el depósito de chatarra "El Capitán" fue realmente de naturaleza administrativa para lo cual no era necesaria una orden judicial.

I.

El 19 de mayo de 1995, la División de Vehículos Hurtados de la Policía de Puerto Rico realizó una serie de inspecciones y registros en varios depósitos de chatarra ("junkers") del área de Caguas sin gestionar previamente una orden de registro o allanamiento. De conformidad con el plan trazado, la Policía entró en las instalaciones del depósito de chatarra "El Capitán", ubicado en la carretera número 1 del Barrio Río Cañas de Caguas. Los propietarios de dicho depósito de chatarra son los recurridos Santiago Ferreira Morales y Santiago Ferreira Ortiz.

Al llegar al local, el policía Carlos E. Rivera Menéndez examinó los permisos de operación del negocio y no detectó irregularidad alguna. Luego de ello, "efectuó una inspección en el lugar donde estaban las piezas [de vehículos de motor]". Petición de Certiorari, a la pág. 2. El Ministerio Público nos expresa que al hacerlo y examinar las piezas que allí se encontraban, los propietarios del depósito de

chatarra no pudieron manifestar cuál era la procedencia "de unas cincuenta y ocho piezas (58)[,] de las cuales siete (7) aparecían con las series mutiladas y una correspondía a un vehículo que había sido declarado hurtado". Id. La intervención inicial de la Policía en el local ocurrió sin que existieran motivos fundados para creer que en el depósito de chatarra se hubiera cometido algún delito.

Ante este cuadro, la Policía incautó las piezas y posteriormente presentó denuncias contra los propietarios de "El Capitán" por infracción al Art. 21 de la Ley de Protección Vehicular, 9 L.P.R.A. secs. 3201-26, el cual penaliza la posesión voluntaria y a sabiendas de vehículos de motor o piezas de éstos con el número de serie mutilado.[1]

En el procedimiento judicial eventual, la defensa de Ferreira Morales y Ferreira Ortiz solicitó la supresión de la evidencia incautada al amparo de la Regla 234 de las de Procedimiento Criminal. 34 L.P.R.A. Ap. II, R. 234. Adujo para ello que la evidencia fue incautada ilegalmente por no haberse obtenido previamente una orden de allanamiento. El Ministerio Público se opuso. A juicio de éste, la actuación de la Policía constituyó un registro administrativo de una actividad comercial estrechamente reglamentada, por lo que era innecesario obtener una orden judicial.

El tribunal de instancia acogió los planteamientos de la defensa y suprimió la evidencia incautada. Inconforme con esta determinación, el

---

[1] Dispone el referido artículo:

Toda persona que voluntariamente y a sabiendas posea alguna pieza o vehículo de motor con los números de motor o serie, o cualquier otro número de identificación impreso por el manufacturero o fabricante o asignado por el Secretario del Departamento de Transportación y Obras Públicas borrado, mutilado, alterado, destruido, desprendido o en alguna forma modificado incurrirá en delito menos grave y convicta que fuere se le impondrá una pena de multa no menor de doscientos (200) dólares ni mayor de quinientos (500) dólares o pena de reclusión que no excederá de seis (6) meses o ambas penas a discreción del tribunal.

La mera posesión de las piezas o vehículos con los números borrados, mutilados, alterados, destruidos, desprendidos, o en alguna forma modificados constituirá

Ministerio Público acudió ante el Tribunal de Circuito de Apelaciones, Circuito Regional VI de Caguas, Humacao y Guayama, mediante recurso de certiorari. Eventualmente, ese foro apelativo denegó la expedición del recurso por entender que este tipo de intervención está proscrita por la Constitución del Estado Libre Asociado de Puerto Rico, toda vez que fue realizada sin que el Estado gestionara una orden judicial basada en causa probable.

El Ministerio Público acudió ante nos señalando como único error esta determinación. Su contención principal consiste en que la intervención realizada por la Policía de Puerto Rico en el depósito de chatarra "El Capitán" fue un registro administrativo de un negocio estrechamente reglamentado, por lo que constituyó una actuación gubernamental exceptuada del imperativo constitucional que obliga al Estado a obtener una orden judicial como condición para realizar un registro, allanamiento o incautación. De este modo, el Ministerio Público nos confronta con la validez constitucional de este tipo de intervención bajo la Constitución del Estado Libre Asociado de Puerto Rico. Atendamos esta controversia de umbral.

## II.

La resolución de la controversia de autos se enmarca en los parámetros de la protección constitucional contra registros, allanamientos e incautaciones irrazonables de la Sección 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. Dicha sección dispone, en parte, que:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
> ...
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse. Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.
> Art. II, Sección 10, Const. de P.R.

En innumerables ocasiones hemos destacado que el objetivo básico de esta disposición, al igual que su equivalente federal,[2] es proteger el ámbito de intimidad y dignidad del individuo frente a actuaciones arbitrarias e irrazonables del Estado. Pueblo v. Yip

---

evidencia prima facie de la posesión voluntaria a que se refiere esta sección. 9 L.P.R.A. sec. 3220.

[2] Véase, Cuarta Enmienda de la Constitución de Estados Unidos.

Como se sabe, la Cuarta Enmienda Federal prescribe sólo el ámbito mínimo de protección que los estados y Puerto Rico están obligados a reconocer. Nuestra referencia a jurisprudencia federal es, en

Berríos, Opinión y Sentencia de 30 de enero de 1997, 142 D.P.R. ___ (1997); Pueblo v. Santiago Alicea, Opinión y Sentencia de 18

de abril de 1995, 138 D.P.R. ___ (1995). Véanse, 1 Ernesto L. Chiesa, Derecho Procesal Penal de Puerto Rico y Estados Unidos 283

(1991); 1 Olga Elena Resumil de Sanfilippo Derecho Procesal Penal 203 et seq. (1990). En términos prácticos, dicha disposición

protege la intimidad y dignidad de los seres humanos, ampara sus documentos y demás pertenencias e interpone la figura de un juez

entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a toda intrusión gubernamental. E.L.A. v.

Coca Cola Bott. Co., 115 D.P.R. 197, 207 (1984); Pueblo v. Dolce, 105 D.P.R. 422, 429-31 (1976).  Como derivado de estos intereses

y del mandato constitucional, todo registro, incautación o allanamiento realizado sin orden judicial se presume inválido, por lo que le

compete al Estado demostrar la razonabilidad de la intervención realizada en tales circunstancias. Finalmente, evidencia obtenida en

violación de la precitada disposición constitucional es inadmisible en los tribunales.

La Sección 10 del Artículo II de nuestra Constitución no proscribe todo tipo de registro, allanamiento o incautación

efectuada sin la previa obtención de una orden judicial fundada en causa probable. Sólo prohibe registros, allanamientos e

incautaciones **irrazonables.** De ahí que la razonabilidad sea el criterio fundamental en la evaluación de si determinada actuación

gubernamental ha transgredido las limitaciones impuestas por nuestra Constitución. La razonabilidad de una intervención

gubernamental, de ordinario, se determina balanceando los intereses presentes a la luz de la totalidad de las circunstancias

involucradas en la actuación gubernamental impugnada. Pueblo v. Yip Berríos, supra; E.L.A. v. Puerto Rico Telephone Co., 114

D.P.R. 394, 402 (1983); Pueblo v. Lebrón, 108 D.P.R. 324, 331 (1979). Véase, 1 Olga E. Resumil de Sanfilipo, Práctica Jurídica

de Puerto Rico 205 (1990).[3]

La protección constitucional contra registros incautaciones y allanamientos irrazonables no sólo aplica a registros de naturaleza criminal o penal, sino también a registros de naturaleza

---

consecuencia, exclusivamente para precisar el contenido mínimo de nuestro equivalente constitucional y con fines ilustrativos.

[3] La existencia de una expectativa menor a la intimidad frente a situaciones variadas en los cuales el Estado posee un interés gubernamental de significativa importancia o ante circunstancias apremiantes en las que no media el consentimiento válido del intervenido, ha justificado el reconocimiento de excepciones al requisito de orden judicial. En Puerto Rico, por ejemplo, hemos validado los registros superficiales incidentales y contemporáneos a un arresto válido, Pueblo v. Dolce, supra; Pueblo v. Zayas Fernández, 120 D.P.R. 158 (1987); Pueblo v. Del Río, 113 D.P.R. 684 (1982); los registros efectuados ante circunstancias apremiantes para preservar la evidencia, Pueblo v. González Román, 100 D.P.R. 651 (1972), Pueblo v. Nieves Vargas, 101 D.P.R. 263 (1978); los registros tipo inventario, Pueblo v. Rodríguez Rodríguez, 128 D.P.R. 438 (1991); y cierto tipo de registros e incautaciones que aunque se efectúan sin orden judicial y sin que existan motivos fundados, en el balance de los intereses antes esbozados, la actuación gubernamental resulta constitucionalmente razonable. Pueblo v. Falú Martínez, 116 D.P.R. 828 (1986) (validando los registros efectuados en las celdas de reclusos ante la expectativa a la intimidad atenuada de éstos y el significativo interés gubernamental en garantizar la seguridad en las cárceles); Pueblo v. Yip Berríos, supra, (reconociendo como válidas las detenciones de vehículos de motor efectuadas por la Policía de Puerto Rico en el contexto de bloqueos de carreteras que responden a un plan no arbitrario).

administrativa. E.L.A. v. Coca Cola Bott. Co., supra. De este modo, "[l]a regla general es, [...], que todo registro, allanamiento o incautación que se realice, no importa su índole penal o administrativa, es irrazonable per se de llevarse a cabo sin orden judicial previa". Id. a la pág. 207.

Sin embargo, el estándar para determinar causa probable para la expedición de una orden de registro en el contexto de registros administrativos es, de ordinario, menos riguroso que el que existe en el ámbito criminal. Id. Como se sabe, distinto a un registro de naturaleza penal, cuyo objetivo principal consiste en la investigación de actividad criminal, los registros administrativos pretenden velar por el cumplimiento de normas, esquemas o reglamentos diseñados para regular diversas actividades legítimas de nuestra sociedad. Véanse, 1 Ernesto L. Chiesa, supra, a la pág. 470; Demetrio Fernández, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme 229 (1993). No obstante, "si el objetivo primario de un registro administrativo es obtener evidencia para un proceso penal, deberá cumplirse con las normas tradicionales exigibles en las causas de naturaleza criminal". E.L.A. v. Coca Cola Bott. Co., 115 D.P.R. a la pág. 213 (énfasis suplido).

En E.L.A. v. Coca Cola Bott. Co., supra, reconocimos, además, que la protección constitucional de la Sección 10 del Art. II se extiende a los establecimientos comerciales. Véanse de la jurisdicción federal, Marshall v. Barlow´s Inc., 436 U.S. 307, 312 (1978); See v. Seattle, 387 U.S. 541 (1967). En ese contexto, el alcance de la protección constitucional estará sujeto a la norma general que requiere balancear los intereses del Estado frente a la expectativa de intimidad reconocible al propietario del comercio en cuestión. Véase, Donovan v. Dewey, 452 U.S. 594, 598-99 (1981).

III.

Ahora bien, en la jurisdicción federal se ha reconocido la existencia de un tipo de industria o actividad comercial en las cuales la

expectativa de intimidad jurídicamente reconocible a sus propietarios está particularmente atenuada. Se trata de las llamadas industrias o comercios estrechamente reglamentados, ("closely regulated industries"). Donovan v. Dewey, supra.

Según la doctrina federal, cierto tipo de comercio o industria se aparta de la norma general en cuanto a los requisitos de orden judicial y causa probable que deben ser satisfechos bajo los estándares de la Cuarta Enmienda Federal. Esta distinción se fundamenta en la existencia de un interés sustancial del Estado sobre determinadas áreas, que, de ordinario, se manifiesta mediante la existencia de una amplia y rigurosa reglamentación gubernamental aplicable a la industria en cuestión. La rigurosidad de la reglamentación gubernamental sobre determinada industria o comercio atenúa la expectativa de intimidad que razonablemente puede albergar una persona.[4]

En tales contextos, el Tribunal Supremo de Estados Unidos y diversos tribunales de menor jerarquía han permitido los registros administrativos sin la previa obtención de una orden judicial. New York v. Burger, 482 U.S. 691, 702 (1987); Donovan v. Dewey, supra, (industria de minas de carbón); U.S. v. Biswell, 406 U.S. 311 (1972) (armas de fuego); Colonnade Catering Corp. v. U.S., 397 U.S. 72 (1970) (bebidas alcohólicas); U.S. v. Acklen, 690 F.2d 70 (6to Cir. 1982) (industria de farmacias); Marshall v. Nolichuckey Sand Co., 606 F.2d 693 (6to Cir. 1979) (areneros y graveras) certiorari denegado en 446 U.S. 908 (1980); S & S Pawn Shop Inc. v. City of Del City, 947 F.2d 432 (10mo Cir. 1991) (casas de empeño); U.S. v. Domínguez-Prieto, 923 F.2d 464 (6to Cir. 1991) (industria de acarreo de bienes). U.S. v. Johnson, 994 F.2d 740 (10mo Cir. 1993) (negocio de disecado de animales); Rush v. Obledo, 756 F.2d 713 (9no Cir. 1985) (hogares de cuidado diurno); U.S. v. Blocker, 104 F.3d 720 (5to Cir. 1997) (industria de seguros); Abateco Services, Inc. v. Bell, 23 Va.App.

---

[4] En palabras del Tribunal Supremo Federal: "the doctrine is essentially defined by "the pervasiveness and regularity of federal regulation and the effect of such regulation upon an owner´s expectation of privacy". New York v. Burger, 482 U.S. a la pág. 701.

504, 477 S.E.2d 795 (1996) (industria de remoción de asbesto); <u>Lievesley</u> v. <u>Commissioner</u>, 985 F.Supp. 206 (1997) (transportistas).

No obstante, el hecho de que jurídicamente la expectativa a la intimidad de un propietario de una empresa o industria estrechamente reglamentada esté atenuada frente al interés gubernamental involucrado, y que en consecuencia, como norma general, no se requiera la obtención de una orden judicial fundada en causa probable para que la intervención estatal sea válida, no significa que no exista protección constitucional alguna. Los propietarios de industrias estrechamente reglamentadas no quedan desprovistos de protección frente a la posibilidad de arbitrariedad por parte de las agencias con jurisdicción sobre sus industrias.

En este contexto, el Tribunal Supremo de Estados Unidos ha establecido que, bajo la Cuarta Enmienda Federal, la validez de los registros administrativos realizados sin orden judicial por funcionarios estatales en negocios estrechamente regulados está condicionada a que se satisfagan los siguientes tres requisitos: (1) debe existir un interés gubernamental sustancial que fundamente el esquema regulador bajo el cual la inspección en cuestión se realiza; (2) la realización de la inspección sin orden debe ser necesaria para adelantar el interés gubernamental; y (3) el programa de inspección que contenga el estatuto debe constituir un sustituto constitucionalmente adecuado a la orden judicial en cuanto a certeza y regularidad. <u>New York</u> v. <u>Burger</u>, <u>supra</u>; <u>véase</u>, 1 Ernesto L. Chiesa, <u>supra</u>, a las págs. 471-72.

Examinadas las normas federales en torno a los registros administrativos de actividades comerciales estrechamente reguladas, evaluemos cuál es la situación en Puerto Rico.

IV.

En <u>HCMA y otros</u> v. <u>Colón Carlo</u>, Opinión y Sentencia de 30 de junio de 1993; 133 D.P.R. ___ (1993), reseñamos la norma prevaleciente en Estados Unidos en torno a los registros administrativos de industrias o negocios estrechamente reglamentados. Sin embargo, allí, por no ser necesario para la adjudicación de la controversia que teníamos ante nuestra

consideración, no incorporamos a nuestro acervo constitucional la doctrina aplicable a este tipo de industrias en la jurisdicción federal. Sin embargo, destacamos que aún en el contexto de registros administrativos podrían existir circunstancias apremiantes que justificarían una desviación de la norma general de requerir una orden judicial basada en causa probable. HCMA y otros v. Colón Carlo, supra; ELA v. Coca Cola Bott. Co., 115 D.P.R. a la pág. 212.

Consideramos, y así lo resolvemos, que bajo la Sección 10 de la Carta de Derechos de nuestra Constitución los registros administrativos de negocios estrechamente regulados configuran una de las excepciones a la norma general esbozada en ELA v. Coca Cola Bott. Co. Co., supra, en cuanto al requisito de orden judicial. El balance de los intereses públicos y privados nos lleva a así actuar.

De ordinario, una industria o actividad comercial es objeto de particular atención por el aparato estatal cuando la actividad realizada incide de manera significativa sobre la seguridad o salud pública. Estas son áreas sobre las cuales el Estado posee un legítimo interés. De este modo, una intervención administrativa en industrias de este tipo es a los ojos del público marcadamente menos nociva a la intimidad que una realizada en negocios que no están bajo el constante examen de las autoridades estatales y en las cuales el Estado no posee un interés de similar envergadura.

Nótese, además, que cuando una persona escoge involucrarse en un negocio cuya operación tiene tangencia con algún aspecto de la salud o seguridad pública y decide gestionar una licencia que autorice su participación en él, lo hace consciente de que los libros y expedientes del negocio así como los propios bienes objeto de la actividad comercial estarán sujetos a una inspección gubernamental muy intensa. El interés gubernamental en velar por el estricto cumplimiento de la reglamentación en el contexto de este tipo de actividad comercial cobra mayor significado frente al reclamo de intimidad personal. En tales circunstancias, resultaría oneroso y, por consiguiente, irrazonable obligar al Estado a que obtenga una orden judicial basada en causa probable para que pueda efectuar de forma válida un registro administrativo. De este modo, los intereses estatales postulados minimizan la expectativa de intimidad que la sociedad puede razonablemente reconocerle al propietario del negocio, y en consecuencia, bajo los parámetros de nuestra Carta de Derechos, resulta razonable la intervención y registro administrativo sin la previa obtención de una orden judicial.

Esta conclusión también encuentra apoyo en la sección 6.1 de la Ley de Procedimiento Administrativo Uniforme. Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. secs. 2101 et seq.. Esta sección consagra la facultad de las agencias administrativas de realizar inspecciones para asegurar el cumplimiento de las leyes y reglamentos que administran,

sujeto a la previa obtención de una orden judicial, salvo en tres circunstancias: en casos de emergencia, cuando el registro es realizado al amparo de las facultades de conceder licencias o permisos, o en casos en que la información es obtenible a simple vista. Aunque esta autorización legislativa no impone limitaciones a la actuación de las agencias administrativas cuando actúan bajo su amparo, no hay duda de que la autorización conferida debe ser interpretada de forma consecuente con los parámetros de la Cuarta Enmienda Federal, y más aún, con nuestros pronunciamientos en torno a la realización de registros administrativos en industrias estrechamente reglamentadas bajo la Sección 10 del Art. II de nuestra Constitución.

En consecuencia, una vez se determina que nos encontramos ante una actividad comercial o industrial de las estrecha o íntimamente reglamentadas, la razonabilidad del registro administrativo sin la obtención de una orden judicial bajo la Sección 10 del Art. II de nuestra Constitución, como norma general, estará condicionada a que se cumplan estrictamente los siguientes criterios: (1) debe existir un interés estatal sustancial que fundamente el esquema regulador; (2) el esquema regulador promueve el interés del Estado; y (3) el esquema regulador de la agencia debe constituir un sustituto constitucional adecuado a la orden judicial en cuanto a certeza y regularidad de la intervención.[5]

Sin embargo, debemos destacar un aspecto. No toda actividad comercial que requiera la obtención de una licencia expedida por el Estado para que una persona pueda realizarla válidamente, o que requiera que la persona en cuestión lleve registros de la operación del negocio, constituye una industria de las estrechamente reglamentadas. Estos elementos, si bien de ordinario están presentes en las actividades que en otras jurisdicciones han sido catalogadas como industrias estrechamente reglamentadas, no son determinantes per se.

Es preciso examinar la naturaleza de la industria en cuestión para determinar si su operación incide sobre la seguridad y salud pública. Así, sin pretender ser exhaustivos, resulta adecuado considerar si el estatuto establece un esquema detallado para la concesión de licencias de ser éstas requeridas; si la operación de la actividad está sujeta al cumplimiento de medidas de seguridad y operación estrictas; y si la

---

[5] Lo que hoy hemos resuelto no altera las normas desarrolladas para determinar la razonabilidad de citaciones administrativas efectuadas como parte de gestiones investigativas. HCMA y otros v. Ileana Colón Carlo, supra; E.L.A. v. P.R.

violación de las disposiciones estatutarias acarrea sanciones civiles y penales, entre otros aspectos. La determinación deberá hacerse mediante un examen caso a caso. Ninguno de estos factores es determinante y su examen debe realizarse integralmente para hacer un adecuado balance entre los intereses públicos y privados.

Aclarado lo anterior, examinemos si el alegado registro administrativo realizado por la Policía de Puerto Rico en el depósito de chatarra "El Capitán" satisfizo las exigencias constitucionales de la sección 10 de la Carta de Derechos de nuestra Constitución, y por tanto, evaluemos si la evidencia obtenida como consecuencia de esa intervención es admisible como prueba de cargo contra los imputados.

La contención fundamental del Procurador General consiste en que se trata de un registro administrativo de una actividad comercial estrechamente reglamentada, por lo que, conforme a la jurisprudencia federal, la Policía no estaba obligada a obtener una orden judicial. Analicemos, por lo tanto, si en Puerto Rico los depósitos de chatarra constituyen una actividad comercial estrechamente reglamentada por el Estado.

V.

En New York v. Burger, supra, el Tribunal Supremo de Estados Unidos resolvió que la industria de depósitos de chatarra era una industria estrechamente reglamentada dentro de los parámetros de la Cuarta Enmienda Federal luego de destacar varias características de este tipo de actividad comercial que evidenciaban que era objeto de una reglamentación sustancial: existía una amplia reglamentación de la actividad de desmantelamiento de vehículos en Nueva York y los demás estados de Estados Unidos; la operación del negocio estaba condicionada a la previa obtención de una licencia de operación y al pago de un cargo; el operador de un depósito de chatarra debía mantener un registro de las piezas que tenía en sus instalaciones; y debía exponer la licencia del negocio en un lugar visible al público; se exponía a la

---

Tel. Co., supra; P.N.P. v. Tribunal Electoral, 104 D.P.R. 741 (1976); Cooperativa Cafeteros P.R. v. Comisionado de Seguros,

imposición de multas y sanciones criminales si incumplía la reglamentación; y la actividad en cuestión constituía una rama de la industria automovilística que ha existido y ha estado regulada por muchos años.[6]

En Puerto Rico se impone similar conclusión. En nuestra jurisdicción, los negocios de depósitos de chatarra están regulados por la Ley Núm. 125 de 27 de junio de 1966, según enmendada. Dicha Ley dispone que para poder dedicarse a esa actividad las personas deberán obtener una licencia expedida por el Secretario del Departamento de Transportación y Obras Públicas. 10 L.P.R.A. sec. 971(c). La solicitud de la licencia deberá acompañarse por un permiso de uso expedido por la Administración de Reglamentos y Permisos, id., además del pago de $250.00 en concepto de derechos. 10 L.P.R.A. sec. 971(h). Una vez obtenida la licencia, la misma deberá ser colocada en un lugar del establecimiento que sea visible a las personas que visitan el depósito. 10 L.P.R.A. sec. 971(i).

El estatuto, además, establece varias condiciones de ubicación que deberán ser satisfechas para que pueda concederse la licencia de operación. Al respecto, advierte que el lugar propuesto para el depósito deberá estar oculto de la vista del público y deberá estar a una distancia no menor de mil (1,000) pies de la carretera, si ésta fuere primaria, o de quinientos (500) en el caso de las demás carreteras. 10 L.P.R.A. sec. 971(d). Asimismo, el Secretario del Departamento de Transportación y Obras Públicas conserva facultad para, en casos específicos y a la luz de las circunstancias particulares del área en donde se propone ubicar el local, fijar una distancia mayor de separación entre el depósito y la servidumbre de la carretera, 10 L.P.R.A. sec. 971(c). Además, posee facultad para establecer aquellas condiciones adicionales que sean necesarias para proteger el valor de las áreas circundantes. 10 L.P.R.A. sec. 971(a).

En cuanto a la operación del negocio, la ley ordena a los propietarios a que toda operación relacionada al depósito sea realizada dentro de las instalaciones, 910 L.P.R.A. sec. 971(d)(d), y a que

---

supra.
[6] La tendencia mayoritaria favorece el examen de los elementos examinados por el Supremo Federal en New York v. Burger, supra, para determinar si nos encontramos ante una industria estrechamente reglamentada. En específico se ha favorecido que el Tribunal Supremo de Estados Unidos haya superado en Donovan v. Dewey, supra, la vieja norma de Marshall v. Barlow´s Inc. que postulaba que una industria era de las estrechamente reglamentadas si y sólo si la industria en

mantengan un libro registro en donde anoten fielmente el nombre, firma y la dirección de la persona que lleva un vehículo al depósito, la fecha en que se recibe, la descripción más completa posible del vehículo o pieza, los números de registro, tablilla, motor o caja del vehículo o las razones por las cuales no puede hacer anotación de estos datos en su libro registro, y cualquier transacción que realice con dicho vehículo o pieza. 10 L.P.R.A. sec. 971(g).  La información contenida en el libro registro deberá ser preservada por no menos de cinco (5) años desde la última entrada en el libro. Id.

Finalmente, la Ley de Depósitos de Chatarra establece que la licencia de operación del negocio:

> deberá ser mostrada para su examen a cualquier agente del orden público [o] representante del Departamento de Hacienda, del Departamento de Transportación y Obras Públicas o de la Junta de Planificación, la Administración de Reglamentos y Permisos **o agente autorizado de cualquier otro departamento o entidad gubernamental**. 10 L.P.R.A. 971(i) (énfasis suplido).

Por otro lado, la Ley de Propiedad Vehicular, Ley Núm. 8 de 5 de agosto de 1987, 9 L.P.R.A. sec. 3201 et seq., también impone restricciones a la operación de un depósito de chatarra.  En específico, dispone en su artículo 12 que todo operador de un depósito de chatarra no podrá "comprar, permutar, vender, recibir en depósito, importar ni exportar vehículos de motor, chatarra o piezas de vehículo con los números de serie borrados, mutilados, alterados, desprendidos, sustituidos, sobrepuestos o en alguna forma ilegibles o destruidos". 9 L.P.R.A. sec. 3211(4).

Más adelante, la misma ley autoriza a la Policía de Puerto Rico o a cualquiera de sus miembros a:

> Inspeccionar cualquier depósito de chatarra, casa vendedora de vehículos de motor o piezas de vehículos de motor, garaje de mecánica, garaje de hojalatería y pintura, e inspeccionar los vehículos o piezas que en dichos lugares se encuentren cuando se tengan motivos fundados para creer que en el mismo se encuentren piezas o vehículos apropiados ilegalmente, robados o desaparecidos. [...]. 9 L.P.R.A. sec. 3216(2) (subrayado nuestro).

---

cuestión tenía una historia de una estrecha reglamentación gubernamental. Véase, La Fave, supra, a la pág. 434.

Como puede apreciarse, la legislación aplicable establece un esquema detallado para la concesión de una licencia para operar un depósito de chatarra. En este sentido, define con precisión los requisitos que deben ser satisfechos para obtenerla y concede discreción al Secretario del Departamento de Transportación y Obras Públicas para hacerlos más rigurosos, así como para establecer condiciones específicas adicionales para que pueda operarse este tipo de negocio.

De igual forma, los estatutos aplicables imponen varios requisitos operacionales que deben ser cumplidos de forma estricta, tales como la exhibición al público de la licencia de operación y mantener al día un registro que contenga los números de serie y de tablilla de todos los vehículos que se encuentren en las instalaciones. Finalmente, la legislación establece un esquema de supervisión del cumplimiento estricto de las disposiciones y establece penalidades por el incumplimiento del esquema.

Por otro lado, no hay duda de que la operación de un depósito de chatarra puede incidir sobre la seguridad pública, al ser un destino potencial de vehículos hurtados. La existencia de un esquema regulador en esta actividad comercial es sólo parte de las medidas tomadas por el Estado para promover la seguridad pública al pretender disuadir el tráfico de piezas de autos hurtados.

Todo lo anterior nos convence de que en Puerto Rico, al igual que en muchos de los estados de Estados Unidos, los depósitos de chatarra constituyen un negocio estrechamente regulado bajo los parámetros de la protección contra registros, allanamientos e incautaciones irrazonables de nuestra Constitución. Por lo tanto, sus operadores poseen una expectativa de intimidad atenuada en relación a su operación.

Examinemos, entonces, los demás elementos que debemos considerar: (1) si existe un interés gubernamental sustancial que fundamente el esquema regulador de la agencia que realiza el registro administrativo;

(2) si el esquema regulador del comercio adelanta el interés estatal; y (3) si el esquema regulador contiene suficientes garantías en cuanto a certeza y regularidad de forma tal que constituye un sustituto adecuado a la orden judicial.

## VI.

### A.

No hay duda de que el Estado tiene un interés sustancial que fundamenta la imposición de restricciones sobre los depósitos de chatarra. En la actualidad, el robo de vehículos de motor constituye un serio problema social. De hecho, en el pasado hemos destacado que "dada su movilidad el automóvil en ocasiones es el medio utilizado por los delincuentes para sus actividades ilícitas y con frecuencia es el producto del delito". Pueblo v. Malavé González, 120 D.P.R. 470, 479 (1988). Para facilitar su tráfico, parte de los vehículos robados son eventualmente desmantelados, lo que convierte a los depósitos de chatarra en un destino potencial de muchas de sus piezas si no existe una fiscalización efectiva de la operación de este tipo de negocio. En vista de ello, el Estado tiene una clara necesidad de imponer restricciones sobre la misma.

El aumento dramático en el número de vehículos per cápita en nuestro País, la alta incidencia delictiva que existe, para la cual, en ocasiones se usan vehículos de motor reconstruidos con piezas robadas, son sólo elementos adicionales que justifican la existencia de una estrecha reglamentación sobre los depósitos de chatarra. En vista de lo anterior, resolvemos que existe un interés gubernamental sustancial que sirve de fundamento adecuado a la existencia de un esquema regulador sobre los negocios de depósitos de chatarra.

Examinemos, entonces el segundo factor que debemos considerar en la evaluación de la razonabilidad de las intervenciones que se realizan en actividades comerciales estrechamente reglamentadas: si el esquema regulador promueve el interés estatal.

### B.

Nuestra evaluación de este segundo criterio requiere que analicemos si el esquema regulador de la actividad comercial --la realización de inspecciones periódicas, la naturaleza de la información requerida en las inspecciones, el tipo de control que se requiere que sea llevado por los operadores del negocio-- permite adelantar el interés que el Estado pretende promover. Sólo es preciso establecer un nexo o relación lógica entre el esquema promulgado y el interés estatal.

En el caso de autos, el esquema propuesto condiciona la operación de un depósito de chatarra a la obtención de una licencia. Las piezas almacenadas en el depósito deberán estar identificadas por números de serie y tablilla, en un libro registro, el cual, además, deberá contener el nombre y dirección de las personas de quienes fueron adquiridas. Estos libros podrán ser inspeccionados por los funcionarios estatales que la propia ley establece.

Sin duda alguna este esquema permite promover el interés del Estado de evitar el robo de vehículos de motor al pretender prevenir que a esta actividad comercial lleguen piezas adquiridas ilegalmente. La obligación del propietario del depósito de mantener un libro que contenga la información aludida constituye una forma de controlar la trayectoria de los vehículos y piezas que entran y salen del depósito de chatarra. El nexo racional entre el esquema y el interés postulado es, en consecuencia, evidente.

Resuelto lo anterior, consideremos finalmente el tercer elemento: si el esquema regulador establecido estatutariamente contiene suficientes garantías en cuanto a certeza y regularidad de forma tal que constituye un sustituto adecuado a la orden judicial.

C.

Según el Tribunal Supremo Federal expresó en New York v. Burger, supra, este tercer requisito significa que:

> [e]l estatuto regulador debe satisfacer las dos funciones
> básicas de la orden judicial: debe advertir al propietario del
> negocio que el registro está siendo realizado al amparo de una

ley y tiene un alcance definido apropiadamente, y debe limitar la discreción de los oficiales inspectores. Id., a la pág. 703.

Estimamos que las garantías en cuanto a certeza y regularidad de un estatuto que autoriza a una agencia administrativa a realizar registros administrativos en negocios estrechamente reglamentados quedan satisfechos adecuadamente bajo la Sección 10 de nuestra Carta de Derechos si se satisfacen, al menos, los siguientes elementos: (1) el estatuto advierte al propietario del depósito de chatarra que su negocio está sujeto a inspecciones no discrecionales por parte de funcionarios públicos al amparo de una ley; (2) el estatuto establece el alcance de la inspección y notifica a su propietario quiénes están autorizados para realizarlo; y (3) el tiempo, lugar y alcance de la inspección está limitado adecuadamente.

De entre estos tres factores, el que ha sido examinado con mayor cautela por los tribunales en Estados Unidos es el concerniente a las limitaciones en cuanto a tiempo, lugar y alcance. Estas limitaciones son esenciales para que el registro administrativo sin orden judicial de un negocio estrechamente regulado sea constitucional al limitar adecuadamente el ejercicio de discreción de los funcionarios estatales. LaFave, supra, a las págs. 438-39.[7] Pero, como veremos, la experiencia en otras jurisdicciones es contraria a una evaluación mecánica, sujeta a reglas estrictas, para determinar si este criterio queda satisfecho.

Como parte de esta determinación algunos tribunales han examinado si el estatuto autoriza que las inspecciones sean realizadas sólo durante horas laborables. Véanse, Horner v. State, 836 P.2d. 679 (Okl.Crim.App. 1992); Commonwealth v. Tart, 557 N.E.2d 1123 (1990); State v. VFW Post 3562, 525 N.E.2d 773 (1988); Yingsum Au v. State,

---

[7] Véanse, U.S. v. Biswell, supra, (en donde se destaca la validez de los registros administrativos sujeto a que sean efectuados "en el contexto de un sistema de inspecciones de negocios que está cuidadosamente limitado en tiempo, lugar y alcance"); véase además, Bionic, Auto Parts & Sales, Inc., v. Fahner, 721 F.2d 1072 (7mo Cir. 1983) (en donde se resuelve que para que se satisfagan los requisitos de certeza y regularidad el programa de inspecciones debe definir

369 S.E.2d 905 (1988); Commonwealth v. Eagleton, 521 N.E.2d. 1363 (1988); Baggett v. State, 722 S.W.2d 700 (Tex.Crim.App. 1987); People v. Krull, 481 N.E.2d 703 (1985); Bionic Auto Parts and Sales, Inc. v. Fahner, supra; Moore v. State, 442 So.2d 215 (Fla.1983); Frey v. Panza, 621 F.2d 596 (3er. Cir.1980); State v. Tindell, 272 Ind. 479, 399 N.E.2d 746 (1980); Lievesley v. Commissioner, supra. De hecho, en New York v. Burger, supra, el Tribunal Supremo de Estados Unidos destacó en su análisis que el estatuto allí considerado sólo permitía los registros administrativos de depósitos de chatarra durante las horas en que estaba abierto al público.

En aquellas circunstancias en las que el estatuto no contiene limitaciones específicas sobre este aspecto, algunos tribunales han evaluado si la agencia administrativa que realiza los registros administrativos ha adoptado claramente esa política. Véanse, Rush v. Obledo, 756 F.2d. 713 (9no Cir.1985); U.S. ex rel. Terraciano v. Mantanye, 493 F.2d 682 (2do Cir. 1974); Antikos v. State, 836 S.W.2d 631 (Tex.Crim.App. 1992).[8]

En cuanto a las limitaciones sobre el alcance, los tribunales han examinado varios aspectos. Por un lado, se ha evaluado si el estatuto o reglamento administrativo, según sea el caso, contiene una declaración específica que precise qué cosas pueden ser examinadas, tales como libros de registro o equipo. Bionic Auto Parts and Sales, Inc. v. Fahner, supra; Hosto v. Brickell, 577 S.W.2d 401 (1979); State v. Tindell, supra. Por otro lado, algunos tribunales han examinado si el estatuto regulador contiene alguna declaración de propósitos que sirva de guía a quien realiza la inspección en términos de qué debe

---

claramente qué será registrado, quién puede registrar y la frecuencia de tales registros).

[8] Véase además, People v. Barnes, 379 N.W.2d 464 (Mich.App. 1985) (en donde el tribunal resolvió que si la realización de un registro administrativo en un depósito de chatarra no ha finalizado a la hora en que el negocio normalmente cierra sus operaciones, el registro tendría que ser interrumpido a menos que en ese momento existiera alguna base para obtener una orden judicial).

examinar para lograr los propósitos de la regulación. Commonwealth v. Accaputo, 404 N.E.2d 1204 (1980).

La frecuencia de las inspecciones es otro aspecto del criterio de regularidad que debe ser evaluado para determinar si el estatuto limita adecuadamente la discreción de los funcionarios gubernamentales. Al respecto, algunos tribunales han examinado si el esquema regulador establece un número máximo de intervenciones que la entidad puede realizar en determinado período; véanse Bionic Auto Parts & Sales, Inc. v. Fahner, supra, (el estatuto examinado limitaba los registros a horario regular de trabajo, establecía un límite máximo de 24 horas de duración y restringía los registros a un máximo de seis (6) en cada período de seis (6) meses); State v. VFW Post 3562, 525 N.E.2d 773 (Ohio 1988); o si se limita la duración de la intervención, Bionic Auto Parts & Sales, Inc. v. Fahner, supra.

Estimamos que limitaciones similares a estas constituyen garantías adecuadas y necesarias para que el esquema regulador satisfaga las exigencias constitucionales de la Sección 10 de nuestra Carta de Derechos, y por tanto, para que constituyan un sustituto adecuado a la orden judicial.

Sin embargo, es preciso destacar que aunque un estatuto satisfaga los criterios de certeza y regularidad requeridos, el mismo no puede autorizar válidamente un registro más amplio dirigido a descubrir evidencia no relacionada con los propósitos legislativos claramente delineados al permitir el registro sin orden. El esquema estatutario no puede constituir una autorización válida de una intervención gubernamental si su objetivo es ajeno a la finalidad de velar por el cumplimiento efectivo del esquema regulador de la actividad comercial afectada. En consecuencia, un registro administrativo de un negocio estrechamente reglamentado no puede convertirse en un registro general en busca de evidencia incriminatoria. Ahora bien, "[s]i en el curso de una inspección civil bona fide se descubre prueba utilizable en un proceso penal, ello de por sí no invalidará el registro". E.L.A. v.

Coca Cola Bott. Co., 114 D.P.R. a la pág. 213. Compete a los tribunales determinar si un registro administrativo es un pretexto para realizar una inspección desvinculada del esquema regulador de la industria o negocio y por tanto, ajena a la inspección administrativa *bona fide*. Pueblo v. Yip Berríos, supra; véanse además, Abel v. U.S., 362 U.S. 217 (1960); U.S. v. Johnson, supra, (en donde agentes federales usaron una inspección estatal como pretexto para hacer un amplio registro investigativo); Long v. Van de Kamp, 772 F.Supp. 1141 (1991).

Por lo tanto, somos de opinión que, si bien la validez de un registro administrativo de una actividad comercial estrechamente reglamentada no está condicionada a la previa obtención de una orden judicial de registro y sí a la concurrencia de los requisitos que hemos discutido, el alcance de la intervención administrativa en tales contextos está limitada a verificar el cumplimiento del esquema regulador que autoriza la Asamblea Legislativa. En consecuencia, los funcionarios estatales autorizados por ley para hacer este tipo de intervención sólo podrán actuar en los establecimientos de acuerdo al esquema regulador.

D.

Al examinar la autorización estatutaria en la que la Policía de Puerto Rico fundamenta su actuación en el depósito de chatarra "El Capitán", lo hacemos consientes de los firmes principios de hermenéutica que requieren que examinemos un estatuto "teniendo presente el propósito social que lo inspiró". González v. E.L.A., Opinión y Sentencia de 26 de abril de 1995, 138 D.P.R. ___ (1995). Esos principios, además, nos obligan a que interpretemos las leyes "dándole sentido lógico a sus diferentes secciones, supliendo las posibles deficiencias cuando esto fuere necesario". Id.; Ramírez de Ferrer v. Mari Brás, Opinión y Sentencia de 18 de noviembre de 1997, 144 D.P.R. ___ (1997) (Opinión de Conformidad Juez Hernández Denton); Zambrana v. E.L.A., Opinión y Sentencia de 30 de enero de 1992, 129 D.P.R. ___ (1992); Torres v. Castillo Alicea, 111 D.P.R. 792 (1981).

En el caso de autos, la disposición estatutaria que el Procurador General señala como la fuente jurídica de la autoridad de la Policía de Puerto Rico para registrar sin orden los depósitos de chatarra es el artículo 5 de la Ley de Depósitos de Chatarra. Dicho artículo impone a los operadores de estos depósitos el deber de mostrar la licencia de operación del negocio a "cualquier agente del orden público [o] representante del Departamento de Hacienda, del Departamento de Transportación y Obras Públicas o de la Junta de Planificación, la Administración de Reglamentos y Permisos o agente autorizado [...]". 10 L.P.R.A. 971(i).

Además, concede libre acceso a la Policía de Puerto Rico a "oficinas, archivos y el área del depósito de chatarra con el fin de inspeccionar el libro registro" que la ley le impone conservar al propietario del depósito. Más adelante, el mismo artículo confiere a la Policía autorización para "ocupar [...] tablillas, registración [sic] y números de series de los vehículos que estén depositados en el local".[9]

Como puede apreciarse, el estatuto advierte claramente a los operadores de depósitos de chatarra que sus instalaciones estarán

---

[9] Este inciso de la ley dispone:

La Policía de Puerto Rico tendrá libre acceso a las oficinas, archivos y el área del negocio de depósito de chatarra con el fin de inspeccionar el libro registro requerido por esta sección. Durante la inspección que practique podrá, además, la Policía ocupar las tablillas, registración [sic] y números de series de los vehículos que estén depositados en el local. 10 L.P.R.A. sec. 971(d)(h).

Por otro lado, la disposición considerada por el Tribunal Supremo Federal en New York v. Burger, supra, que confería a la Policía de New York la facultad de registrar los depósitos de chatarra disponía en parte:

Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises .... The failure to produce such records or to permit such inspection on the part of any person required to be registered pursuant to this section as required by this paragraph shall be a class A misdemeanor. Ley de Vehículos y Tránsito de New York, sec. 415-a5.

sujetas a inspecciones por parte de funcionarios estatales. Al respecto, identifica quiénes son lo funcionarios autorizados para realizarlo. Véase, HCMA y otros v. Colón Carlo, supra.

El alcance de la intervención está también demarcado en el estatuto. De este modo, limita el registro administrativo a la constatación de que el operador del depósito posee una licencia vigente y al examen del libro registro en donde se detalla la procedencia de las piezas y vehículos que están en el local. En el caso específico de la Policía de Puerto Rico, la ley le confiere autoridad para entrar al área administrativa con el objetivo exclusivo de inspeccionar el libro registro. Una lectura del estatuto sugiere que el área administrativa a la cual puede tener acceso la Policía de Puerto Rico está limitada y condicionada a aquellas áreas a las cuales sea necesario entrar para examinar el libro registro.

Finalmente, el estatuto autoriza a la Policía a "ocupar" tablillas, números de registro y de serie. El estatuto no define bajo qué circunstancias se puede "ocupar" tal información. Sin embargo, una interpretación razonable e integral del esquema regulador revela que la "ocupación" de piezas que autoriza está predicada en la existencia de motivos fundados por parte de la Policía de Puerto Rico de que las mismas son robadas. Véase, 9 L.P.R.A. sec. 3216.

Los números de serie de las piezas, por su parte, pueden ser inspeccionados por la Policía sin que para ello sea necesario incautarse de las piezas. Se trata de evidencia que puede ser observada visualmente sin necesidad de ocupar la pieza. Adviértase, que la Ley de Propiedad Vehicular prohibe a los dueños de depósitos de chatarra o a sus operadores adquirir por cualquier forma vehículos o piezas de éstos con el número de serie mutilado o alterado. 9 L.P.R.A. sec. 3211(4). Esta prohibición es parte del esquema regulador existente en nuestra jurisdicción sobre esta actividad comercial y su cumplimiento puede ser eficientemente constatado mediante la inspección de las piezas que hay en el local.

Por otro lado, el estatuto no contiene ninguna limitación específica en cuanto al horario en que pueden ser realizados los registros o en cuanto al tiempo máximo que deben durar. Tampoco limita la frecuencia con que estas inspecciones pueden ser realizadas, ni establece criterios de selección de las instalaciones que serán inspeccionadas. Asimismo, el Ministerio Público no nos expresa que tales limitaciones están contenidas en algún reglamento o memorando administrativo.

Aunque ciertamente podría plantearse que esta omisión incide sobre la certeza y regularidad del estatuto, estimamos que en el presente caso su ausencia no alcanza niveles constitucionalmente irrazonables. El estatuto no autoriza la realización de los registros a cualquier hora del día o de la noche. Tampoco autoriza la realización de las inspecciones fuera de horas laborables.

Estimamos que una lectura razonable y justa del Art. 5(h) de la Ley de Depósitos de Chatarra requiere que las inspecciones sean realizadas durante horas laborables del negocio. Una interpretación contraria viciaría el estatuto de inconstitucionalidad. Véanse, Yingsum Au v. State, 369 S.E.2d 905 (1988) (el lenguaje del estatuto era demasiado amplio al permitir la intervención estatal fuera de horas laborables); People v. Krull, 481 N.E.2d 703 (1985) (el estatuto impugnado dejaba demasiada discreción al funcionario estatal al permitir los registros "a cualquier hora durante el día o la noche"); State v. VFP Post 3562, supra, (el estatuto examinado no contenía limitación alguna en cuanto al horario en que podían ser efectuadas las inspecciones); Bagget v. State, 722 S.W.2d 700 (Tex.Crim.App. 1987) (el estatuto impugnado era inconstitucional de su faz por no contener ninguna garantía procesal). De hecho, surge de los autos que la intervención de la Policía en el presente caso fue realizada durante horas laborables.

Por lo anterior, resolvemos que el Art. 5(h) de la Ley de Depósitos de Chatarra, como autorización estatutaria para realizar

registros administrativos en los depósitos de chatarra sin la previa obtención de una orden judicial fundada en causa probable, posee la certeza y regularidad necesaria para constituir un sustituto adecuado a la orden judicial bajo la Sección 10 del Art. II de nuestra Constitución. Nuestra interpretación del estatuto que autoriza la realización de los registros administrativos en los depósitos de chatarra tiene como finalidad suplir sus posibles deficiencias sin desvirtuar el propósito principal que la inspiró. González Pérez v. E.L.A., Opinión y Sentencia de 26 de abril de 1995, 138 D.P.R. ___ (1995).

Resolvemos que la Policía de Puerto Rico puede realizar válidamente intervenciones administrativas en este tipo de negocio al amparo de dicho artículo.


VII.

La conclusión anterior, sin embargo, no pone punto final a la consideración del presente caso. La parte recurrida plantea en su alegato que el registro realizado en el depósito de chatarra "El Capitán" fue de índole penal y no administrativa.

Los autos no nos permiten hacer una determinación completa sobre este aspecto. La minuta de la vista de supresión de evidencia no recoge el testimonio prestado por los testigos en torno a las circunstancias específicas que rodearon la intervención policiaca. Tampoco contamos con una transcripción de evidencia.

Por otro lado, el foro de instancia no resolvió este asunto. Su determinación de suprimir la evidencia se basó exclusivamente en el hecho de que la Policía de Puerto Rico no demostró que tuviera una orden judicial. Así, sólo contamos con alegaciones de los recurridos, que aunque no han sido contradichas, no constituyen fundamento apropiado para una adjudicación en apelación. Por ello, consideramos apropiado devolver el caso al foro de instancia para que se realice la vista correspondiente en la cual se dilucide cualquier controversia

fáctica en torno a la forma en que fue realizado el operativo y, por consiguiente, se dilucide la naturaleza del registro realizado por la Policía en el depósito de chatarra "El Capitán". Véanse, Pueblo v. Yip Berríos, supra; U.S. v. Johnson, supra; Long v. Van de Kamp, supra.

En vista de ello, procede revocar la determinación del Tribunal de Circuito de Apelaciones y devolver el recurso al foro de instancia para que examine la prueba de las partes sobre la naturaleza del registro y determine si el objetivo de la intervención policiaca en el depósito de chatarra "El Capitán" fue ajeno a la verificación del cumplimiento del esquema regulador diseñado para la actividad comercial, en cuyo caso el tribunal deberá decretar la supresión definitiva de la evidencia incautada.

Se emitirá la correspondiente sentencia.


Federico Hernández Denton
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

  Peticionario

      v.                                    CC-96-136      Certiorari

Santiago Ferreira Morales y
Santiago Ferreira Ortiz

  Recurridos


SENTENCIA


San Juan, Puerto Rico, a 10 de diciembre de 1998.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se expide al auto de certiorari solicitado y se revoca la Sentencia emitida por el Tribunal de Circuito de Apelaciones, Circuito Regional VI, en el presente caso. Se devuelve el caso al Tribunal de Primera Instancia para que, tras los trámites correspondientes, realice una vista evidenciaria y determine si el registro realizado en el depósito de chatarra "El Capitán" el 19 de mayo de 1995 fue de naturaleza administrativa o de naturaleza penal. De resolver que el registro fue de índole penal, procederá a decretar la supresión de la evidencia incautada por la Policía en el depósito de chatarra.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri hace constar que "concurre con la opinión mayoritaria sólo en cuanto a que debe revocarse el dictamen del Tribunal de Circuito de Apelaciones. En su criterio, la situación del caso de autos es una de un negocio estrechamente regulado, en la cual la Policía realizó un registro válido, conforme a las normas aplicables a tales negocios. Disiente en cuanto al dictamen mayoritario de

devolver el recurso al foro de instancia para que éste indague sobre los supuestos objetivos de la intervención policíaca".


                        Isabel Llompart Zeno
                    Secretaria del Tribunal Supremo