Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>JOSÉ HIRAM ROSADO ZAYAS<br><br>Recurrido | KLCE202400810 | *CERTIORARI*<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Aibonito<br><br>Criminal Núm.:<br>B LA2023G0010-12<br>B SC2023G0022-24<br><br>Por: Art. 6.08, 6.09 y 6.22 de la Ley Núm. 168-2019; Art. 401, Ley Núm. 404-2000 |
|---|---|---|

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 22 de octubre de 2024.

Comparece ante nos el Pueblo de Puerto Rico representado por la Oficina del Procurador General de Puerto Rico ("el Estado" o "Peticionario") mediante una *Petición de Certiorari* presentada el 22 de julio de 2024. Nos solicita que revoquemos la *Resolución* emitida el 30 de mayo de 2024 y notificada el 11 de junio del mismo año, por el Tribunal de Primera Instancia, Sala Superior de Aibonito ("foro primario" o "foro *a quo*"). Por virtud del aludido dictamen, el foro primario declaró *Ha Lugar* la solicitud de supresión de evidencia presentada por José Hiram Rosado Zayas ("señor Rosado" o "Recurrido"). El fundamento para tal determinación obedeció a que la evidencia ocupada en la residencia del Recurrido fue producto de un registro irrazonable. Por tanto, concluyó el foro primario que se le violaron los derechos del Recurrido cobijados bajo el Artículo II, Sección 10 de la Constitución de Puerto Rico, *infra*, toda vez que el Estado no logró rebatir la presunción de ilegalidad de una incautación sin orden judicial.

Número Identificador

SEN2024_____

Por los fundamentos que expondremos a continuación, **expedimos** el auto de *certiorari* y **confirmamos** el dictamen recurrido.

**I.**

Por hechos ocurridos el 30 de junio de 2022, el Ministerio Público presentó seis (6) denuncias contra el señor Rosado por infracciones a los Artículos 6.08, 6.09 y 6.22 de la Ley de Armas de Puerto Rico de 2020, Ley Núm. 168-2019, según enmendada, 25 LPRA secs. 466g, 466h,466u (en adelante, "Ley de Armas" o "Ley 168-2019") y el Artículo 401 de la Ley de Sustancias Controladas de Puerto Rico, Ley Núm. 4 de 23 de junio de 1971, según enmendada, 24 LPRA sec. 2401.[1] Tras celebrarse la vista preliminar y haberse sometido las correspondientes acusaciones por violaciones a los precitados artículos, el 4 de abril de 2024, el señor Rosado presentó escrito intitulado *Moción: Supresión de Evidencia por Registro y Allanamiento Realizado sin Orden Judicial.*[2] Mediante este, alegó que el 30 de junio de 2022, se realizó un allanamiento sin orden judicial en su residencia. Argumentó que los agentes de la Policía de Puerto Rico no tenían autorización para estar en dicho lugar y que estos utilizaron como subterfugio el hecho de que se encontraban realizando un registro administrativo para personarse en la referida propiedad. De igual manera, el señor Rosado adujo que no autorizó tal registro, pues se encontraba detenido en la Comandancia de la Policía. En ese sentido, reiteró que se le violaron sus derechos constitucionales y que la evidencia incautada era suprimible debido a la manera en que se obtuvo la misma.

En respuesta, el 5 de abril de 2024, el Ministerio Público, presentó *Moción en Oposición a Supresión de Evidencia.*[3] En esta,

---

[1] Véase, Apéndice del Recurso, págs. 3-12.
[2] *Íd.*, págs. 25-32.
[3] *Íd.*, págs. 33-38.

explicó que, tras diligenciar una orden de registro contra un vehículo de motor, se puso bajo arresto al señor Rosado y a su esposa, Desireé Cotto Colón ("señora Cotto"). Arguyó que a esta última, se le ocupó un arma legal que portaba al momento de la detención y se le explicó el proceso administrativo al amparo del Art. 2.03 de la Ley de Armas, *supra*. En ese sentido, el Ministerio Público aseveró en su escrito que "[d]icho proceso administrativo consiste en la ocupación de todas las armas de fuego que estuvieran a su nombre para eventualmente la Policía de Puerto Rico realizar la investigación administrativa correspondiente. (Art. 2.13 Ley Núm. 168, Ley de Armas de Puerto Rico)".[4] Por tal razón, enfatizó que el motivo del agente de la Policía de Puerto Rico, Edward Cintrón Ruiz ("agente Cintrón" o "Agente") para acudir a la residencia del Recurrido fue de naturaleza administrativa y no penal. Además, indicó que, mientras la señora Cotto buscaba las armas legales en el cuarto y el Agente se encontraba en el balcón de la residencia, este se percató, a simple vista, de que había un arma en el sofá por lo que le inquirió a la Sra. Cotto si era una de las armas para las cuales tenía licencia. Ante su respuesta en la negativa, el Estado esbozó que, en ese momento, el agente Cintrón le advirtió que el proceso administrativo se tornó en uno criminal y las armas ilegales y la droga fueron incautadas.

Así las cosas, el 24 de abril de 2024, se llevó a cabo la vista de supresión de evidencia. Allí el Ministerio Público **únicamente** presentó el testimonio del agente Cintrón junto a la prueba documental que se desglosa a continuación:

Exhibit 1 - Foto, imagen del vehículo
Exhibit 2 - Foto haciendo entrega de la orden
Exhibit 3 - Certificado de Ciencias Forenses
Exhibit 4 - PPR 618.4
Exhibit 5A - 5B - Fotos de armas
Exhibit 6 - Certificado de análisis químico de la droga ocupada

---

[4] *Íd.*, pág. 37.

Exhibit 7A - Inventario de lo ocupado

Exhibit 7B - Solicitud de análisis.[5]

Sometida la prueba por parte del Ministerio Público, el foro primario declaró *Con Lugar* la supresión de la evidencia.[6] Además, el foro *a quo* adelantó que haría constar sus determinaciones de hecho y derecho por escrito. De esta forma, el 30 de mayo de 2024, el foro primario emitió su *Resolución.*[7] Mediante esta, formuló unas las siguientes determinaciones de hechos transcritas a continuación:

La vista de Supresión de Evidencia comenzó con la explicación de que la intervención con el acusado fue producto del diligenciamiento de una Orden para realizar un registro y allanamiento al vehículo Mazda B-2500 color negro propiedad del acusado, en búsqueda de sustancias controladas (Marihuana y cocaína). Esta Orden fue solicitada por el Agente Melvin Martínez ante la Hon. Jenny Malavé Núñez del Tribunal Municipal de Aibonito, la cual fue producto de una vigilancia realizada por el agente Martínez contra el señor José Hiram Rosado Zayas; dirigida exclusivamente al vehículo antes descrito. La Orden fue diligenciada el 30 de junio de 2022, aproximadamente a las 7:00 pm en la Carretera 726 en un terreno yermo en Abonito, por el agente declarante Edward A. Cintrón.

Manifiesta el agente Cintrón que, de la intervención con el acusado y su vehículo, en la carretera 726 jurisdicción de Aibonito, donde el acusado era el conductor y su esposa iba pasajera; se procedió a diligenciar la Orden judicial. Se procede a registrar al conductor y en la puerta de ese lado del vehículo, lado había una cartera tipo "mariconera", la abre y en su interior encuentra un frasco blanco con letras que dicen Santax, dentro había múltiples pastillas y pedazos de pastillas que según su experiencia eran "sanax". Además, ocupó cuatro (4) municiones para un rifle calibre .22, por lo que procede a leerle las advertencias y pone bajo arresto a los dos (2) ocupantes del vehículo, al acusado y a su esposa de nombre Desireé Cotto Colón. **Informa que ambas personas estaban tranquilas y no prestaron ninguna resistencia a la intervención.**

En la intervención y proceso de arresto de la señora Cotto Colón, ésta le informa que posee licencia para portar armas ya que poseía en ese momento un arma de fuego. El agente Cintrón informa que ellos, la Policía, lo sabían previo a la intervención porque como parte de la investigación del agente Martínez, éste lo había corroborado antes de solicitar la Orden Judicial. **Informa que le orientó a la señora Cotto Colón que una vez culminada la intervención se procedería con el procedimiento administrativo con relación a otras armas legales que ella tenía registradas a su nombre, una (1) pistola y dos (2) rifles; en ese momento ella portaba la pistola.**

---

[5] *Íd.*, pág. 41.
[6] *Íd.*
[7] *Íd.*, págs. 74-80.

Alega el agente que al preguntarle por las otras dos (2) armas, ésta le informa que se encontraban en su residencia. **Estando la señora arrestada, informa el agente que procedió a orientar a la señora Cotto, que realizarían un "registro administrativo" en su casa para ocupar las otras dos armas registradas a su nombre.** Proceden a llevar al acusado arrestado José Hiram Rosado Zayas, a la Comandancia de la Policía de Aibonito; y él junto al agente Martínez proceden a llevar a la señora Cotto Colón, también arrestada, primero a su residencia y luego la llevan a la Comandancia de Aibonito.

Afirma el agente Cintrón, que el Artículo 2.13 de la Ley de Armas de Puerto Rico, Ley 168 de 11 de diciembre de 2019, conocida como Ley de Armas de Puerto Rico de 2020, le faculta a arrestar a la ciudadana, transportarla a su residencia, buscar allí sus otras armas. registradas y luego continuar con el procedimiento criminal del arresto y encausamiento del delito por el que fue arrestada.

El agente Cintrón informa que llegaron a la residencia con la señora arrestada, en el Barrio Caonillas sector la Tea en Aibonito, ésta abre la residencia por la puerta del balcón para buscar las otras armas legales de la señora, que tenía guardadas allí. Al abrir la puerta del balcón, alegadamente desde la ubicación en que él está, pudo ver en un sillón dentro de la casa, a simple vista, que había un revolver en un bulto dentro de una bragueta y le pregunta a la señora si esa arma era de ella, ésta le contesta que no. Le informa que en ese momento, el registro administrativo que había ido a realizar para ocupar las armas legales se convertía en un asunto criminal. Informa que procede a entrar y va al bulto, y dentro del bulto había un rifle y sustancias, que resultaron ser cocaína y marihuana. Él, la señora Cotto y personal de servicios técnicos pasaron al área del cuarto para ocupar las armas legales. Una vez en el cuarto se ocuparon los dos (2) rifles de la señora con sus municiones y se trasladaron a la división de inteligencia criminal de Aibonito.

Informa el agente que no verificó ningún otro lugar de la residencia, patio, marquesina, baños, closets, cuartos, debajo de la cama, gavetas, cocina, alegadamente porque no tenía un Orden Judicial (Énfasis suplido).[8]

Ante esto, el foro *a quo* concluyó que el registro realizado por la policía fue uno irrazonable y, por lo tanto, violatorio del Artículo II, Sección 10 de la Constricción de Puerto Rico, *infra*. Además, concluyó que, el lenguaje provisto en el Artículo 2.13 de la Ley de Armas, *supra*, únicamente faculta al agente del orden público a ocupar las armas que una persona tenga en su **inmediata presencia**. Dictaminó que la prueba del Ministerio Público no logró rebatir la presunción de ilegalidad que pesa sobre los registros sin orden. Finalmente, la *Resolución* dispuso que "[l]a interpretación

---

[8] *Íd.*, págs. 74-75.

amplia brindada por el agente al Artículo 2.13 de la Ley de Armas de 2020, *supra*; excede el ámbito que el artículo persigue proteger en el balance de intereses del poder de estado versus los derechos constitucionales de los ciudadanos".[9]

Inconforme, el Ministerio Público presentó *Moción en Solicitud de Reconsideración a Supresión de Evidencia*.[10] En lo pertinente, reiteró que de una lectura del Artículo 2.13 de la Ley de Armas, *supra*, no surgía que el agente del orden público tuviera que ocupar únicamente las armas legales que tuviera una persona en su inmediatez, tal y como concluyó el foro primario. Asimismo, reiteró que, en el caso de marras, se configuró la excepción de un registro a simple vista conforme lo reconoce nuestra jurisprudencia. Evaluada la moción presentada, el 19 de junio de 2024, el foro primario emitió *Resolución* en la cual declaró *No Ha Lugar* la reconsideración instada.[11] Sustentó su determinación al amparo del Artículo 2.13 de la Ley de Armas, *supra*, y la Regla 11 de Procedimiento Criminal, 34 LPRA Ap. II R.11, la cual faculta al agente del orden público a realizar una intervención, arresto, registro y allanamiento, sin orden judicial previa, en aquellos casos que existen motivos fundados para creer que la persona a ser arrestada ha cometido un delito en su presencia o ha cometido un delito grave aunque no haya sido en su presencia.

Insatisfecho aun, el 22 de julio de 2024, el Estado presentó *Petición de Certiorari*, y formuló los siguientes señalamientos de error:

> El Tribunal de Primera Instancia cometió un error de derecho y abusó crasamente de su discreción al suprimir la droga y las armas ilegales incautadas en la residencia de los señores Rosado Zayas y Cotto Colón. Esto, al ignorar que el agente Cintrón Ruiz observó, a plena vista, la evidencia ilegal incautada, mientras se disponía a ocupar administrativamente, las armas que la señora Cotto Colón

---

[9] *Íd.*, pág. 80.
[10] *Íd.*, págs. 81-92.
[11] *Íd.*, págs. 94-96.

poseía legalmente en dicha casa, luego que esta le permitiese voluntariamente la entrada.

El Tribunal de Primera Instancia cometió un error de derecho y abusó crasamente de su discreción al suprimir la droga y las armas ilegales incautadas en la residencia de los señores Rosado Zayas y Cotto Colón. Esto, al determinar que el Artículo 2.13 de la Ley de Armas no faculta a un agente del orden público a ocupar administrativamente, y sin orden judicial, aquellas armas que la persona arrestada no tenga en su posesión inmediata.

El Tribunal de Primera Instancia cometió un error de derecho y abusó crasamente de su discreción al suprimir la droga y las armas ilegales incautadas en la residencia de los señores Rosado Zayas y Cotto Colón. Esto, al aplicar la norma de exclusión de evidencia, sin considerar la excepción de la doctrina de la buena fe, según reconocida en Heien v. North Carolina, 574 U.S. 54 (2014). Dicha excepción permite la admisión de evidencia incautada, sin orden judicial, cuando un policía cree razonablemente, y de buena fe, que una ley autoriza tal actuación.

Cónsono con lo antes expuesto, el 15 de agosto de 2024, esta Curia emitió una *Resolución* en la que, entre otras cosas, le concedió un término de diez (10) días al Recurrido para que mostrara causa por la cual no debíamos expedir el auto de *certiorari* y revocar la determinación recurrida. Posteriormente, el 22 de agosto de 2024, el Estado presentó escrito intitulado *Solicitud de Vista Oral.* Mediante esta, el Peticionario justificó su petitorio fundamentado en el propósito de discutir, entre otros asuntos, el alcance del Artículo 2.13 de la Ley de Armas, *supra.* En cumplimiento con la orden emitida, el 28 de agosto de 2024, el Recurrido compareció por virtud de su *Contestación a Petición de Certiorari.* Posteriormente, el 30 de junio de 2024, esta Curia declaró *Ha Lugar* la solicitud de vista oral y tras las partes ofrecernos fechas hábiles para la celebración de la misma, el 3 de septiembre de 2024, emitimos *Resolución* y señalamos la aludida vista oral para el 19 de septiembre de 2024.

Luego de celebrada la vista oral y con el beneficio de la comparecencia de ambas partes y haber escuchado la regrabación de la vista de supresión de evidencia efectuada ante el foro primario

procedemos a exponer la normativa jurídica aplicable a la controversia objeto del recurso de epígrafe.

## II.

### A. Certiorari

"[U]na resolución u orden interlocutoria, distinto a una sentencia, es revisable mediante *certiorari* ante el Tribunal de Apelaciones". *JMG Investment v. ELA et al.*, 203 DPR 708, 718 (2019). "El recurso de *certiorari* es un mecanismo procesal de carácter discrecional que le permite a un tribunal de mayor jerarquía revisar las determinaciones del tribunal recurrido". *Rivera et al. v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023). Los límites a la facultad revisora del foro apelativo tienen como propósito evitar la dilación que causaría la revisión judicial de controversias que pueden esperar a ser planteadas a través del recurso de apelación. *Scotiabank v. ZAF Corp. et al.*, 202 DPR 478, 486-487 (2019).

No obstante, la discreción del tribunal apelativo en este aspecto no opera en un vacío ni sin parámetros. *Torres González v. Zaragoza Meléndez, supra*; *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 712 (2019). La Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, señala los criterios que se deben tomar en consideración al evaluar si procede expedir un auto de *certiorari*. Estos criterios son:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F)     Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G)     Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

El Tribunal Supremo ha expresado que la discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Mun. de Caguas v. JRO Construction, supra*, págs. 712.

### B.  Registros y Allanamientos

La Cuarta Enmienda de la Constitución Federal, Emda. IV, Cont. EE. UU., LPRA, Tomo 1, así como el Art. II Sec. 10 de nuestra Constitución, disponen que todo ciudadano goza del derecho a protección contra registros, incautaciones y allanamientos irrazonables que puedan afectar su persona, casas, papeles y efectos.  Art. II, Sec. 10, Const. ELA, LPRA, Tomo 1.  El propósito de dichas garantías constitucionales es proteger el derecho a la intimidad y dignidad del individuo frente a actuaciones arbitrarias e irrazonables del Estado. *Pueblo v. López Colón*, 200 DPR 273, 284 (2018).

Nuestra Máxima Curia ha establecido que dicha garantía constitucional responde a tres objetivos principales, a saber: (1) disuadir a los funcionarios del orden público para que no violen la Constitución; (2) proteger la integridad de los tribunales al no permitir que en los procesos judiciales se utilice evidencia obtenida ilegalmente; y (3) evitar que el Estado se beneficie de sus propios actos ilegales. *Pueblo v. Rivera Surita*, 202 DPR 800, 806 (2019).

La jurisprudencia interpretativa sobre la aludida cláusula constitucional contra registros y allanamientos irrazonables ha establecido una presunción de invalidez cuando estos se llevan a cabo sin orden judicial previa. *Pueblo en el interés del menor N.O.R.*, 136 DPR 949, 961 (1994). Como norma general, se requiere que se

obtenga una orden judicial para efectuar un registro. *Pueblo v. Báez López, 1*89 DPR 918, 927-928 (2013). Ante un reclamo sobre una violación del derecho constitucional contra registros y allanamientos es necesario dilucidar si, en efecto, hubo un registro que haya infringido la expectativa razonable de intimidad sobre el objeto registrado. "Para ello, es determinante establecer si la persona tiene un derecho de abrigar una expectativa razonable de intimidad dentro de las circunstancias particulares que rodean el caso y si ese derecho está reconocido por nuestra sociedad". *Íd.*, pág. 929.

Entre los factores que se deben considerar para determinar si la persona registrada tenía una expectativa razonable de intimidad, se encuentran los siguientes: 1) el lugar registrado o allanado; 2) naturaleza y grado de intrusión de la intervención policiaca; 3) el objetivo o propósito de la intervención; 4) si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad; 5) la existencia de barreras físicas que restrinjan la entrada o visibilidad al lugar registrado; 6) la cantidad de personas que tienen acceso legítimo al lugar registrado, y 7) las inhibiciones sociales relacionadas con el lugar registrado. Ninguno de estos factores es determinante, debiendo examinarse todos en conjunto. *Pueblo en el interés del menor N.O.R., supra,* pág. 962.

Una vez se determina que existe una expectativa razonable de intimidad que pueda estar protegida por dicha garantía constitucional y que se efectuó un registro por parte del Estado, "se debe realizar un balance de intereses entre esa expectativa y los intereses públicos que hayan motivado la actuación estatal". *Pueblo v. Báez López, supra*, pág. 929, citando a *Pueblo v. Díaz Bonano,* 176 DPR 601 (2009).

No obstante, el mero hecho de que la prueba haya sido incautada sin una orden previa de un tribunal, por sí solo, no conlleva la inadmisibilidad de la evidencia obtenida. "En estos

casos, el Ministerio Público debe rebatir la presunción de invalidez **demostrando la existencia de alguna de las circunstancias excepcionales que justifican actuar sin una orden judicial previa**" (Énfasis suplido). *Íd.,* pág. 930.

Nuestro Máximo Foro ha adoptado y definido situaciones excepcionales en donde no es indispensable la existencia de una orden judicial previa. Para así hacerlo, el Tribunal Supremo de Puerto Rico ha sido enfático en establecer que cada una de estas situaciones excepcionales "no responden a reglas automáticas y deben examinarse a la luz de los hechos específicos de cada caso". *Íd.* En las siguientes circunstancias se ha reconocido que existe una expectativa razonable de intimidad y por tanto no se viola el mandato constitucional, a saber: 1) un registro incidental a un arresto legal; 2) **un registro consentido voluntariamente de forma expresa o implícita;** 3) un registro en situación de emergencia; 4) una evidencia ocupada en el transcurso de una persecución; 5) **una evidencia a plena vista**; 6) cuando el agente de orden público obtiene conocimiento de material delictivo por el olfato; 7) una evidencia arrojada o abandonada; 8) un registro o allanamiento de una estructura abandonada; 9) **una evidencia obtenida durante un registro administrativo, siempre que cumpla con las limitaciones expresadas en *Blassini et als. v. Dpto. Rec. Naturales,* 176 DPR 454 (2009)**; 10) un registro tipo inventario; o 11) una evidencia obtenida en un lugar público -como el aeropuerto- como resultado de la utilización de canes para olfatear. (Énfasis suplido) *Pueblo v. Álvarez De Jesús,* 214 DPR ___ (2024), 2024 TSPR 87, resuelto el 12 de agosto de 2024, págs. 13-14.

Como mencionamos, entre las excepciones reconocidas se encuentra el registro de material ilegal percibido a plena vista. En *Pueblo v. Dolce,* 105 DPR 422, 436 (1976), nuestro Máximo Foro estableció los requisitos necesarios para la aplicación de la referida

doctrina: 1) **el artículo debe haberse descubierto por estar a plena vista y no en el curso o por razón de un registro;** 2) **el agente que observe la prueba debe haber tenido derecho previo a estar en la posición desde la cual podía verse tal prueba**; 3) debe descubrirse el objeto inadvertidamente y 4) la naturaleza delictiva del objeto debe surgir de la simple observación.

Por otro lado, otra de las excepciones reconocidas en nuestra jurisprudencia es el registro consentido voluntariamente de forma expresa o implícita (tácita). *Pueblo v. Álvarez De Jesús, supra,* pág. 17. En cuanto a la renuncia implícita nuestro Máximo Foro ha expresado que: "[u]na forma en que se entiende prestado el consentimiento implícito es aquella donde una persona obedece sin protestar al pedido de un funcionario; la persona no accede expresamente pero su acto, en unión a un examen de la totalidad de las circunstancias, demuestra su intención de consentir el registro". *Pueblo en interés menor N.O.R., supra,* pág. 965. La persona que renuncia a la protección constitucional, valida la actuación del Estado. *Íd.*

**Para determinar si medió una renuncia expresa o tácita se deben evaluar los siguientes criterios: "1) si medió fuerza o violencia; 2) si el registro fue practicado después de un arresto, y 3) si se encontraban otras personas presentes. La prueba sobre la renuncia a este derecho ha de ser clara, demostrativa de que no existió coacción verdadera de clase alguna, directa o indirecta"** (Énfasis suplido). *Pueblo v. Álvarez De Jesús, supra,* pág. 17.

Ahora bien, la validez de un registro consentido se determinará mediante un examen de la totalidad de las circunstancias que rodean el caso, así como de las características de la persona que consiente y el ambiente en el cual se prestó.

*Pueblo v. Santiago Alicea I,* 138 DPR 230, 238-239 (1995). Sobre ello,

nuestro Máximo Foro dispuso lo siguiente:

> [a]l examinar el ambiente existente cuando se consintió al registro, hay que considerar si la persona que consintió fue amenazada, intimidada físicamente o maltratada por la Policía; si descansó en promesas o representaciones falsas de la Policía, y si se encontraba en un lugar público o aislado. Por otra parte, entre las características personales que se examinarán se encuentran: (1) la edad; (2) la inteligencia promedio; (3) la educación; (4) si la persona estaba intoxicada o bajo la influencia de drogas al momento de prestar el consentimiento; (5) **si la persona consintió luego de ser informada de su derecho de rehusarse a consentir o habérsele dado las advertencias "Miranda", y** (6) **si había sido arrestado anteriormente y, por lo tanto, tenía conocimiento de las protecciones que provee el sistema legal a los sospechosos de un delito**. Cuando la persona inicialmente no permitió el registro, pero posteriormente lo autorizó, hay que determinar si el permiso fue obtenido ante la amenaza de que si el ciudadano no consentía entonces la Policía obtendría una orden de registro y entraría de todas formas. *Pueblo v. López Colón, supra,* págs. 289-290.

### C. *Protección contra Registro y Allanamiento Administrativo*

Como reseñáramos, al amparo de nuestra Constitución, "[n]o se

violará el derecho del pueblo a la protección de sus personas, casas,

papeles y efectos contra registros, incautaciones y allanamientos

irrazonables". Art. II, Sec. 10, Const. ELA, LPRA, Tomo 1. Además,

será requisito para la expedición de una orden de registro que sea

expedida "por autoridad judicial, y ello únicamente cuando exista

causa probable apoyada en juramento o afirmación, describiendo

particularmente el lugar a registrarse, y las personas a detenerse o

las cosas a ocuparse". *Íd.*

Esta protección aplica tanto a los registros penales como a los

administrativos. *Véase ELA v. Coca Cola Bott. Co.,* 115 DPR 197, 207

(1984). Es sabido que, distinto a un registro de naturaleza penal,

cuyo objetivo principal consiste en la investigación de actividad

criminal, los registros administrativos "pretenden velar por el

cumplimiento de normas, esquemas o reglamentos diseñados para

regular diversas actividades legítimas de nuestra sociedad". *Pueblo*

*v. Ferreira Morales*, 147 DPR 238, 250–51 (1998) (citas omitidas).

Ahora bien, si el objetivo principal de dicho registro administrativo

es obtener prueba para un proceso penal, deberá cumplirse con las normas exigibles en las causas de naturaleza penal. *E.L.A. v. Coca Cola Bott. Co., supra*, pág. 213.

De igual forma, en los casos relacionados a registros administrativos, prospera la regla general referente a que un registro sin orden se presume ilegal. Nuestro Tribunal Supremo ha expresado que, no empece la autorización para el registro haya sido concedida por estatuto, **esto no impide que aplique la regla general**. *Íd.*, pág. 208. No obstante, la expedición de una orden tiene el efecto automático que sostenga que el registro efectuado por virtud de esta sea razonable.

> La relación entre los valores concernidos puede variar de contexto a contexto. Consideramos que existen diferencias entre el procedimiento criminal y el administrativo de orden civil que son de tal índole que en determinadas circunstancias justifican en el contexto administrativo una visión más flexible de la garantía constitucional en lo que respecta a la forma de medir la causa probable. *Íd.*, págs. 212-213

Por su parte, nuestra jurisprudencia ha establecido que se puede llevar a cabo un registro administrativo en una industria íntimamente reglamentada siempre que se cumplan con los siguientes requisitos: 1) la existencia de un interés sustancial que fundamente el esquema regulador de la agencia que realiza el registro administrativo; 2) si el esquema regulador del comercio o actividad realizada adelanta el interés del Estado, y 3) si el esquema regulador contiene suficientes garantías en cuanto a la certeza y regularidad de los registros, de forma tal que constituya un sustituto adecuado al requisito constitucional de una orden judicial previa. *Blassini v. Depto. Rec. Naturales, supra*, págs. 465–466.

Asimismo, en *Pueblo v. Ferreira Morales, supra*, pág. 263 se dispuso lo que sigue:

> Estimamos que las garantías en cuanto a certeza y regularidad de un estatuto que autoriza a una agencia administrativa a realizar registros administrativos en negocios estrechamente reglamentados quedan satisfechos bajo la Sec. 10 del Art. II de nuestra Carta de Derechos ... si

se satisfacen, al menos, los siguientes elementos: (1) el estatuto advierte al propietario ... que su negocio está sujeto a inspecciones no discrecionales por parte de funcionarios públicos al amparo de una ley; (2) el estatuto establece el alcance de la inspección y notifica a su propietario quiénes están autorizados para realizarlo; y (3) el tiempo, lugar y alcance de la inspección está limitado adecuadamente. (Énfasis omitido)

### D. La Regulación de las armas en Puerto Rico

En el 2008, el Tribunal Supremo de Estados Unidos resolvió *District of Columbia v. Heller*, 554 US 570 (2008). En dicho caso, el Máximo Foro federal aclaró que la Segunda Enmienda de la Constitución de Estados Unidos garantiza un derecho individual a poseer y portar armas. Ello, pues el componente central de la aludida disposición constitucional se cimenta en el derecho que poseen los ciudadanos a la defensa propia. Dos (2) años después, ese mismo foro resolvió *McDonald v. Chicago*, 561 US 742 (2010). En esa ocasión, el Máximo Foro federal concluyó que este derecho proveniente de la Segunda Enmienda es uno fundamental y que en virtud de la Decimocuarta Enmienda de la Constitución de Estados Unidos este se extiende a los estados de la Unión.

Así pues, este reconocimiento es igualmente extensivo a Puerto Rico ya que se le ha reconocido a los ciudadanos americanos residentes en Puerto Rico los mismos derechos fundamentales que la Decimocuarta Enmienda de la Constitución federal consagra. *Pueblo v. Colon González*, 209 DPR 967, 981, (2022) Sin embargo, es preciso destacar que este derecho **no es absoluto ni ilimitado** *Pueblo v. Rodriguez López et al.*, 210 DPR 752, 768 (2022) citando a *District of Columbia v. Heller, supra*, pág. 595.

Recientemente, el Tribunal Supremo de Estados Unidos determinó que, los estados pueden imponer regulaciones y limitaciones, al derecho de poseer y portar armas siempre y cuando cumplan con un estándar denominado el *text-and-history test.* Véase, *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 US 1 (2022). En ese sentido, nuestra más Alta Curia en *Pueblo v.*

*Rodriguez López, supra,* concluyó que una disposición de la anterior Ley de Armas de Puerto Rico, Ley 404-2000, era válida por ser "consistente con la tradición histórica de regular las armas de fuego nacionalmente mediante la exigencia de una licencia o un permiso". *Pueblo v. Rodríguez López et al., supra,* pág. 782. Por ello, se satisfizo el estándar exigido en *New York State Rifle & Pistol Assn., Inc. v. Bruen, supra.*

Ahora bien, actualmente en Puerto Rico rige Ley de Armas de Puerto Rico de 2020, Ley Núm. 168-2019, según enmendada, 25 LPRA sec. 461 *et seq.* Dicho estatuto derogó la anterior Ley de Armas de Puerto Rico, Ley 404-2000, con el propósito de atemperar nuestro estado de derecho a lo resuelto por el Tribunal Supremo de Estados Unidos en *District of Columbia v. Heller, supra* y *McDonald v. Chicago, supra.* Conforme surge de la propia exposición de motivos de la citada ley:

> Ante las decisiones del Tribunal Supremo Federal, resulta necesario el tomar acción para salvaguardar y proteger los derechos de los ciudadanos americanos residentes en Puerto Rico, mediante una nueva Ley de Armas que sea consistente con la Segunda Enmienda de la Constitución de Estados Unidos, con las decisiones del Tribunal Supremo federal, y dejar claro que, en Puerto Rico el portar y poseer armas de fuego es un derecho fundamental, e individual, al igual que en el resto de la Nación. Esta Ley se crea de conformidad con las leyes federales aplicables a este asunto.

Conforme a lo antes expuesto, la aludida legislación establece el procedimiento que un ciudadano debe seguir si desea tener una licencia de portación y uso de armas de fuego. Véase, Artículo 2.02, 25 LPRA sec. 462a. En concreto, la Oficina de Licencias de Armas, es la unidad del Negociado de la Policía de Puerto Rico encargada de todo lo relacionado a la expedición de licencias de armas. Esta licencia se expedirá en aquellos casos en el que se cumpla con los requisitos contenidos en el Artículo 2.02 de la Ley de Armas, *supra.* No empece actualmente poseer un arma es un derecho fundamental, el mismo no es absoluto. Por tanto, el estatuto dispone un procedimiento de ocupación de armas cuando haya motivo

fundado de comisión de delito grave (Art. 202 Ley de Armas) o cuando un ciudadano con licencia haya sido acusado de delito grave o sustantivo (Art.208 Ley de Armas). El aludido Artículo 2.08 de la ley lee como sigue:

> Luego de una determinación de causa probable para el arresto de cualquier persona que posea una licencia de armas por la comisión de uno o más delitos graves o sus tentativas, el tribunal, ordenará la **suspensión provisional** e incautación de la licencia hasta una determinación final y firme en el proceso criminal. El Tribunal ordenará la **ocupación inmediata de todas** las armas de fuego y /o municiones de la persona con licencia de armas, las cuales se consignarán en el depósito de armas y municiones del Negociado de la Policía de Puerto Rico. 25 LPRA sec. 462g.

Cónsono con lo anterior, el Artículo 2.09 dispone que la Oficina de Licencias de Armas revocará las licencias de armas ya emitidas, a cualquier persona convicta por cualquier delito grave su tentativa, por cualquier delito menos grave que conlleve violencia y aquellos delitos por conducta constitutiva de violencia domestica o asecho. "En aquellos casos donde la licencia de armas sea revocada, el Comisionado procederá a ocupar las armas de fuego y/o municiones que posea la persona con licencia de armas". 25 LPRA sec. 462h.

Por otro lado, la Ley es clara en torno a las situaciones en que un agente del orden público podrá ocupar armas de fuego **sin orden judicial**. Sobre esos fines, el Artículo 2.13 de la Ley de Armas establece que:

> **Cualquier agente del orden público ocupará la licencia, arma de fuego y/o municiones, que posea un ciudadano, de forma temporera cuando tuviese motivos fundados para entender que la persona con licencia de armas hizo o hará uso ilegal de las armas de fuego y municiones para causar daño a otras personas**; por haber proferido amenazas de cometer un delito; por haber expresado su intención de suicidarse; cuando haya demostrado negligencia o descuido en el manejo del arma de fuego; cuando se estime que la persona con licencia de armas padece de una condición mental, se le considere ebrio habitual o sea adicto a sustancias controladas; o en cualquier otra situación de grave riesgo o peligro que justifique esta ocupación.
>
> **Un agente del orden público estará facultado a ocupar el arma de fuego, licencia y municiones, de forma temporera, cuando se arreste al tenedor de la misma por**

**la comisión de un delito grave o delito menos grave que implique intimidación o violencia.** El agente del orden público tendrá setenta y dos (72) horas para consignar las armas de fuego y/o municiones ocupadas en un depósito de armas del Negociado de la Policía y notificar al Departamento de Justicia (Énfasis suplido). 25 LPRA sec. 462l.

Finalmente, merece la pena destacar el lenguaje del Artículo 2.02 (d) (8) de esta legislación:

El Comisionado tendrá la facultad, cuando tenga motivos fundados y sospecha razonable y de forma pasiva, sin perturbar la paz y tranquilidad del investigado o interrumpir la privacidad del hogar, para realizar investigaciones que estime pertinentes después de otorgarse la licencia al peticionario, para investigar las querellas presentadas por proveer información falsa en contra de la persona con licencia de armas. Si después de realizada la investigación pertinente resultare que el peticionario ha dado información falsa a sabiendas en su solicitud o no cumple con los requisitos establecidos en esta Ley, se procederá de inmediato a la revocación e incautación de la licencia de armas **y a la incautación de todas las armas de fuego** y municiones que tuviera el peticionario, quedando este sujeto a ser procesado por el delito de perjurio y por las correspondientes violaciones a esta Ley o cualquier otra ley aplicable. Si el ciudadano se negare a cooperar con el proceso, la policía acudirá a buscar una orden de registro y allanamiento para incautar las armas y municiones (Énfasis suplido). 25 LPRA sec. 462a.

### E. Doctrina de la Buena Fe en casos criminales

El Tribunal Supremo de Estados Unidos, ha desarrollado una excepción a la regla de exclusión de evidencia ilegalmente obtenida conocida como la doctrina de buena fe. Dicha norma consiste en no aplicar la regla de exclusión a aquella evidencia obtenida que se encuentre reñida con la Cuarta Enmienda federal, por no estar presente o estar muy disminuido el fundamento de disuasión. E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, San Juan, Ed. Situm, 2017, págs. 264-265. Si un agente del orden público descansa, de buena fe, en la validez de una orden judicial que posteriormente se determina que fue expedida sin causa probable, no aplicaría la norma de exclusión. *Íd.* El motivo de ello se fundamenta en que el costo de aplicar tal exclusión, no se justificaría. *Íd.* Esto fue lo que precisamente se resolvió en *United States v. Leon* 468 US 897 (1984).

Sin embargo, el Tribunal Supremo federal fue enfático en que dicha norma no es aplicable a aquellos casos en que la nulidad de la orden surja de su faz, o cuando se presente una declaración jurada por un declarante que conoce de su falsedad, o cuando la ausencia de causa probable fuese patente. Chiesa Aponte, *op. cit.*, pág. 266.

Ahora bien, esta misma norma acogida en *United States v. Leon, supra,* también se implementó en *Illinois v. Krull*, 480 US 340 (1987). En aquella ocasión, la Máxima Curia federal utilizó el mismo razonamiento de la doctrina de la buena fe, pero en el contexto de un estatuto que autorizaba un registro sin orden. Chiesa Aponte, *op. cit.*, pág. 269. Si un agente del orden público descansa de buena fe, en que existe un **estatuto que le autoriza a realizar un registro sin orden y surge que posterior a dicho registro, el estatuto es declarado inconstitucional, entonces aplicaría la doctrina de buena fe**. *Íd.* Claro está, todo registro que se hiciera por virtud de la ley que ha sido invalidada sería suprimible a partir de que el Tribunal Supremo decretara su inconstitucionalidad. *Íd.* Asimismo, se aclaró que esta excepción no sería aplicable cuando el estatuto en cuestión es patentemente inconstitucional. *Íd.*

De la misma manera, en *Heien v. North Carolina*, 574 US 54 (2014), el Tribunal Supremo federal incorporó una nueva vertiente de esta doctrina. En dicho caso, se resolvió que **la doctrina de buena fe era aplicable en casos en el que los policías cometieran errores razonables tanto de hechos como de derecho en una intervención**. Chiesa Aponte, *op. cit.*, págs. 271-272.

No empece lo anterior, el Tribunal Supremo de Puerto Rico no se ha expresado sobre la aplicación de esta doctrina de buena fe en nuestra jurisdicción. En *Pueblo de Puerto Rico v. Muñoz Santiago*, 131 DPR 965, 991–992 (1992) nuestro Máximo Foro expresó: "[e]n vista de que hemos resuelto que no procedía la supresión de

evidencia en los casos ante nuestra consideración, no entraremos a dilucidar si debe o no ser adoptada en nuestra jurisdicción la doctrina de buena fe establecida en *United States v. León*, 468 U.S. 897 (1984). La discusión de este planteamiento se pospondrá para la ocasión en que la situación fáctica del caso amerite su discusión". De igual manera ocurrió, en *Pueblo de Puerto Rico v. Santiago Feliciano*, 139 DPR 361, 433 (1995). Posterior a la determinación federal en *Hein v. North Carolina* el Tribunal Supremo de Puerto Rico en *Pueblo v. Rolón Rodriguez*, 193 DPR 166, 185 (2015) tampoco estimó oportuno resolver el planteamiento relacionado al registro de buena fe, conforme surge en la nota al calce número 10 incluida en el mismo. [12]

### III.

En el presente recurso, el Estado nos solicita que revoquemos una *Resolución* dictada por el foro primario en la cual declaró *Ha Lugar* una moción de supresión de evidencia instada por el señor Rosado. Nos presenta, como primer señalamiento de error, que el foro *a quo* incidió en su dictamen al ignorar que el agente Cintrón observó, a plena vista, la evidencia incautada mientras se disponía a ocupar administrativamente, las armas que la señora Cotto poseía legalmente en su residencia, tras argüir que esta última le permitió voluntariamente la entrada. Asimismo, como segundo señalamiento de error, el Peticionario indica que el foro primario erró en su dictamen al determinar que el Artículo 2.13 de la Ley de Armas, *supra*, no faculta a un agente del orden público a ocupar administrativamente y sin orden judicial, aquellas armas que la

---

[12] Conforme surge de dicha nota al calce, el Tribunal Supremo de Puerto Rico expresó: "[t]ampoco procede, según nos solicita el Estado, aplicar la doctrina de buena fe, con el pretexto de que el agente "actuó bajo un marco de objetiva razonabilidad (y de buena fe) cuando confió en la autoridad general que le confería la orden de allanamiento. [...] Dado que en el caso que nos ocupa la insuficiencia de la orden de allanamiento diligenciada se constata de su propia faz, estimamos que los argumentos del Estado son inmeritorios, puesto que la doctrina es claramente inaplicable a los hechos que nos ocupan.".

persona arrestada no tenga en su posesión inmediata. Finalmente, como tercer señalamiento de error, aduce que, en este caso, deberíamos adoptar doctrina de la buena fe, según reconocida en *Heien v. North Carolina, supra,* la cual permite la admisión de evidencia incautada, sin orden judicial, cuando un policía razonablemente y de buena fe cree que una ley autoriza tal actuación.

Por su parte, el señor Rosado insiste en que el Artículo 2.13 de la Ley de Armas, *supra,* dispone claramente que la ocupación que puede hacer un agente del orden público de un arma legalmente registrada debe ser aquella que se encuentre en posesión inmediata del ciudadano intervenido. De igual manera, sostiene el Recurrido que al encontrarse bajo arresto la señora Cotto, esta no se encontraba en capacidad para proveer una autorización libre y voluntaria al policía de entrar a su casa, pues se hallaba bajo sumisión, presión y arresto de la Policía. Veamos.

Por encontrarse íntimamente relacionados, procederemos a discutir el primer y segundo señalamiento de error de manera conjunta. En el presente caso, se nos pide que revisemos la *Resolución* emitida por el foro primario la cual suprimió la evidencia incautada por la Policía de Puerto Rico en la residencia de la señora Cotto y el Recurrido. Conforme esgrime el Estado, la aludida prueba fue ocupada ya que el agente Cintrón, a simple vista, observó armas y drogas en el interior de la residencia de la pareja. En nuestra jurisdicción, es norma reiterada que se puede incautar sin orden judicial, evidencia ilegal que se encuentre a plena vista. Para ello, es indispensable que concurran los siguientes requisitos:

> 1) El artículo debe haberse descubierto por estar a plena vista y no en el curso o por razón de un registro.
>
> **2) El agente que observe la prueba debe haber tenido derecho previo a estar en la posición desde la cual podía verse tal prueba.**
>
> 3) Debe descubrirse el objeto inadvertidamente.

4) La naturaleza delictiva del objeto debe surgir de la simple observación. (Énfasis suplido) *Pueblo v. Dolce, supra.*

Ahora bien, en el caso de marras, la controversia estriba en si el agente que alegadamente observó la prueba a simple vista tenía derecho a estar en la propiedad. Para justificar el cumplimiento de el aludido requisito, el Estado sostuvo que el agente Cintrón tenía derecho a estar en la residencia del Recurrido al amparo de dos (2) fundamentos: 1) la señora Cotto, quien reside con el Recurrido, voluntariamente dirigió al agente a la residencia, configurándose así un consentimiento voluntario al registro y, 2) el Artículo 2.13 de la Ley de Armas, *supra,* lo autorizaba estar allí.

En primer lugar, es preciso atender el asunto en cuanto al presunto consentimiento voluntario de la señora Cotto para que se realizara una ocupación administrativa de armas legales en su residencia. Recientemente, el Tribunal Supremo de Puerto Rico discutió la figura del consentimiento a un registro en *Pueblo v. Álvarez De Jesús, supra.* Allí, nuestro más Alto Foro enfatizó que, en nuestra jurisdicción, un ciudadano puede consentir voluntariamente a un registro y por consiguiente renunciar a la protección de la Cuarta Enmienda de la Constitución de Estados Unidos y la Sección 10, del Artículo II de la Constitución de Puerto Rico. El aspecto medular para establecer que dicho consentimiento sea válido es que el mismo **sea voluntario** y **que sea prestado por una persona con autoridad para hacerlo.** *Pueblo v. Álvarez De Jesús, supra,* pág. 15. Para ello, entre otros supuestos, debe considerarse los siguientes criterios:

1) si medió fuerza o violencia;

2) si el registro fue practicado después de un arresto, y

3) si se encontraban otras personas presentes. La prueba sobre la renuncia a este derecho ha de ser clara, demostrativa de que no existió coacción verdadera de clase alguna, directa o indirecta. *Íd.,* pág. 17.

Examinados los planteamientos esbozados en *Pueblo v. Álvarez De Jesús, supra,* nuestra más Alta Curia validó el consentimiento a una prueba de alcohol en un accidente vehicular, luego de conferirle completa deferencia a una determinación de hecho formulada por el Tribunal de Primera Instancia, en la que dispuso que, tras evaluar la prueba que tenía ante sí, dictaminó que el consentimiento fue **voluntario y libre de coacción**. *Pueblo v. Álvarez De Jesús, supra*, págs. 22-23.

Contrario a lo ocurrido en *Pueblo v. Álvarez De Jesús, supra,* en el caso de epígrafe, **no contamos con una determinación de hecho formulada por el foro primario en cuanto a que se haya materializado el consentimiento voluntario de la señora Cotto**. El foro primario se limitó a determinar que se le orientó a la señora Cotto sobre el "registro administrativo", que dejaron al Recurrido en la Comandancia de la Policía de Aibonito y procedieron a llevar, **también arrestada**, a la señora Cotto a su residencia. De igual forma consta en las determinaciones de hecho que el agente Cintrón entendía que el Artículo 2.13 de la Ley de Armas, *supra*, le confería autoridad para "**arrestar a la ciudadana, transportarla a su residencia, buscar allí sus otras armas registradas y luego continuar con el procedimiento criminal del arresto y encausamiento del delito por el cual fue arrestada**" (Énfasis suplido).[13]  Por otro lado, vale destacar que  el foro *a quo*, **no le dio credibilidad al testimonio vertido por el agente Cintrón, único testigo que sentó a declarar el Ministerio Público en la vista de supresión de evidencia**.[14] Es decir, la prueba del Ministerio Público

---

[13] Véase, Apéndice del Recurso, pág. 75.

[14] Ello surge claramente de la grabación de la vista de supresión de evidencia, mientras el Ministerio Público, posterior a la determinación de *Con Lugar* a la moción de supresión evidencia presentada por el recurrido, realizó una argumentación al foro primario en cuanto al derecho aplicable en el caso. El juez que presidió los procedimientos aclaró que **no le dio credibilidad al agente Cintrón en cuanto a su testimonio referente a la autorización de la señora Cotto para estar en la residencia**. *Regrabación de la vista de supresión de evidencia*, celebrada el 24 de abril de 2024, **Min. 2:21:10- Min. 2:22:05.**

no persuadió al juzgador de los hechos sobre si el alegado consentimiento se prestó de forma voluntaria y libre de coacción, máxime cuando el alegado consentimiento **fue prestado posteriormente a un arresto**.

Por tanto, conforme a la norma reiterada referente a que un registro sin orden judicial se presume ilegal y por tanto le corresponde al Estado rebatir dicha presunción, era necesario que el Ministerio Público presentara prueba a esos fines para demostrar que dicho registro sin orden cumplió con las distintas excepciones reconocidas en nuestro ordenamiento jurídico vigente. De un examen minucioso tanto del expediente, como de la regrabación de la vista de supresión de evidencia, determinamos que no se desprende que el Ministerio Público presentó prueba en la vista de supresión a esos fines, ni logró demostrar la voluntariedad del consentimiento por parte de la señora Cotto. Toda vez que el foro *a quo*, tampoco le dio credibilidad al único testigo que sentó a declarar el Ministerio Público es forzoso concluir que, en el caso de marras, no cabe hablar de consentimiento al registro en este caso. Por ello, **colegimos que el agente Cintrón no tenía derecho a estar en la residencia del Recurrido por este fundamento.**

Aclarado lo anterior, corresponde atender el alcance del Artículo 2.13 de la Ley de Armas, *supra*. El Peticionario sostiene que este artículo faculta a los agentes de orden público a realizar una ocupación administrativa de armas legales y que la misma no está supeditada a las armas que se encuentren en la presencia inmediata de la persona intervenida. Así pues, el Estado reitera que el agente Cintrón tenía derecho a estar en la casa del Recurrido, pues este se encontraba realizando una ocupación administrativa como consecuencia del registro autorizado mediante orden judicial a esos efectos en el vehículo en el que se encontraban la señora Cotto y el Recurrido.

En primera instancia, es preciso destacar que el Artículo 2.13 no dispone expresamente sobre la incautación de **todas** las armas legales autorizadas bajo la licencia de armas conferida. Dicho artículo dispone lo siguiente:

> Cualquier agente del orden público ocupará **la licencia, arma de fuego y/o municiones, que posea un ciudadano, de forma temporera cuando tuviese motivos fundados para entender que la persona con licencia de armas hizo o hará uso ilegal de las armas de fuego y municiones para causar daño a otras persona**s; por haber proferido amenazas de cometer un delito; por haber expresado su intención de suicidarse; cuando haya demostrado negligencia o descuido en el manejo del arma de fuego; cuando se estime que la persona con licencia de armas padece de una condición mental, se le considere ebrio habitual o sea adicto a sustancias controladas; o en cualquier otra situación de grave riesgo o peligro que justifique esta ocupación (Énfasis suplido).

De una lectura del texto previamente citado, notamos que la Asamblea Legislativa fue precisa en cuanto lo que quería plasmar en esta disposición. De entrada, destacamos que la aludida disposición va dirigida a un tipo de funcionario: "**los agentes de orden público**". El Artículo 1.02 (a) define agente de orden público de la siguiente forma:

> "Agente del Orden Público" — significa aquel integrante u oficial del Gobierno del Estado Libre Asociado de Puerto Rico o de Estados Unidos de América, así como cualquier subdivisión política de Puerto Rico o de Estados Unidos, entre cuyos deberes se encuentra el proteger a las personas y la propiedad, mantener el orden y la seguridad pública; y efectuar arrestos. Esto incluye, pero sin limitarse, a todo integrante del Negociado de la Policía de Puerto Rico, de la Policía Municipal, del Negociado de Investigaciones Especiales, Cuerpo de Vigilantes del Departamento de Recursos Naturales y Ambientales, Oficiales de Custodia del Departamento de Corrección, del Programa de Servicios con Antelación al Juicio, de la Guardia Nacional, Agente de Seguridad de la Autoridad de Puertos, mientras se encuentren en funciones o ejercicios oficiales, los Inspectores del Negociado de Transporte y Otros Servicios Públicos, los Agentes Especiales Fiscales y los Agentes e Inspectores de Rentas Internas del Departamento de Hacienda y los Alguaciles de la Rama Judicial de Puerto Rico y de los del tribunal federal con jurisdicción en todo Puerto Rico. 25 LPRA. Sec. 461.

Nótese que el correspondiente el Artículo 2.13 no va dirigido exclusivamente al Negociado de la Policía de Puerto Rico, sino que incluye distintas agencias administrativas, y las faculta a realizar la ocupación en diversas instancias. Para efectos de la discusión del

presente caso, nos limitaremos a la facultad conferida al Negociado de la Policía en los casos en que existan motivos fundados de que la persona con licencia de armas hizo o hará uso ilegal de las armas de fuego y municiones para causar daño a otras personas. Si realizamos un análisis minucioso del primer párrafo del Artículo 2.13, *supra*, podemos ver con claridad lo dispuesto en el mismo. La **acción** que delega el Artículo 2.13, *supra*, es la **ocupación**; el **objeto** que se va a ocupar es la "licencia, arma de fuego y/o municiones, que posea un ciudadano" y la **justificación** para la realización de la aludida acción es cuando el agente del orden público tuviera "**motivos fundados** para entender que **la persona con licencia** de armas hizo o hará **uso ilegal de las armas de fuego**". De igual manera, la disposición es clara al establecer el elemento de **temporalidad** de la ocupación, al establecer expresamente que es "de forma temporera." A nuestro juicio el primer párrafo del Art. 2.13, *supra*, contiene **un lenguaje certero y preciso** en cuanto la acción que autoriza y sus circunstancias.

En conformidad con lo anterior el segundo párrafo del Artículo 2.13, contiene la siguiente expresión:

> Un agente del orden público estará facultado a ocupar **el arma** de fuego, licencia y municiones, de forma temporera**, cuando se arreste** al tenedor de la misma **por la comisión de un delito grave o delito menos grave que implique intimidación o violencia**. El agente del orden público tendrá setenta y dos (72) horas para consignar **las armas de fuego y/o municiones ocupadas** en un depósito de armas del Negociado de la Policía y notificar al Departamento de Justicia (Énfasis suplido).[15]

El fragmento previamente citado, detalla en tiempo y espacio, el momento específico en que el agente del orden público podrá ocupar las armas, **al momento del arresto**. Luego de ello, el agente tendrá un periodo de tiempo para el depósito de armas del Negociado

---

[15] Cabe señalar que, surge de la regrabación, que, al momento de la intervención, el señor Rosado fue cooperador durante la intervención "con una conducta propia de cualquier ser humano". *Regrabación de la vista de supresión de evidencia*, celebrada el 24 de abril de 2024, Min. 21:55- Min. 22:25.

de la Policía de Puerto Rico y notificar al Departamento de Justicia. Ello pues, conforme el Art. 7.09 de la Ley de Armas, *supra,* es el Negociado de la Policía la entidad encargada del recibo, custodia y disposición de armas que sean ocupadas o depositadas voluntariamente, por personas con licencia de armas. 25 LPRA sec. 467h.

Ahora bien, como principio hermenéutico, "las leyes no deben ser interpretadas tomando aisladamente algunas de sus secciones, párrafos u oraciones, sino que deben serlo tomando en consideración todo su contexto". *Class Fernandez v. Metro Health Care Management System,* Inc., 2024 TSPR 63, 213 DPR ___, pág. 18 (citas omitidas). Por ello, el texto del primer párrafo del Artículo 2.13, *supra,* cobra mayor relevancia cuando se contrasta con el lenguaje del Artículo 2.08 de la Ley de Armas, el cual dispone que, tras una determinación de causa probable para arresto de cualquier persona que posea una licencia de armas por la comisión de delito "el tribunal, ordenará la **suspensión provisional** e incautación de la licencia hasta una determinación final y firme en el proceso criminal. El Tribunal ordenará la **ocupación inmediata de todas** las armas de fuego y /o municiones de la persona con licencia de armas, las cuales se consignarán en el depósito de armas y municiones del Negociado de la Policía de Puerto Rico". 25 LPRA sec. 462g.

Obsérvese que, contrario al Artículo 2.13 de la Ley de Armas, *supra,* que dispone el proceso cuando existe motivo fundado de la comisión de un delito grave, el legislador precisó su intención de que se ocupen **todas** las armas de una persona con licencia luego de una determinación de causa probable.[16] Una vez más, el lenguaje

---

[16] El texto del Art. 2.08 de la Ley de Armas, *supra,* lee como sigue:

Luego de una determinación de causa probable para el arresto de cualquier persona que posea una licencia de armas por la comisión de uno o más delitos graves o sus tentativas, el tribunal, ordenará

utilizado por el legislador es preciso en torno a que en esta circunstancia específica procede a la incautación de **todas** las armas.

En conformidad con lo anterior, en este contexto, "la fuente que se ha de consultar para descifrar la verdadera intención del legislador es el historial legislativo del estatuto en cuestión, incluyendo la exposición de motivos de la ley, los informes rendidos por las comisiones de las cámaras y los debates celebrados en el hemiciclo". *Class Fernandez v. Metro Health Care Management System, Inc., supra,* (citas omitidas).

Así las cosas, el 11 de diciembre de 2019, se aprobó la Ley 168-2019, la Ley de Armas vigente. Dicha legislación derogó la Ley

---

la suspensión provisional e incautación de la licencia hasta una determinación final y firme en el proceso criminal. El Tribunal ordenará la ocupación inmediata de todas las armas de fuego y /o municiones de la persona con licencia de armas, las cuales se consignarán en el depósito de armas y municiones del Negociado de la Policía de Puerto Rico. El Negociado de la Policía de Puerto Rico tendrá setenta y dos (72) horas para consignar para la custodia todas las armas de fuego y/o municiones de la persona con licencia de armas en el Depósito de Armas y Municiones del Negociado de la Policía. De resultar el acusado con una determinación de no culpabilidad, o no causa, según corresponda, en cualquier etapa del proceso criminal y el ministerio público ha agotado todos los remedios reconocidos en las Reglas de Procedimiento Criminal, salvo que exista una orden de protección en su contra por violencia de género, acecho o maltrato en cualquiera de sus vertientes, el juez vendrá obligado ministerialmente por esta Ley a ordenar la inmediata devolución de la licencia de armas y de todas las armas de fuego y municiones. Toda arma de fuego y munición devuelta deberá entregarse en la misma condición en que se ocuparon. La persona con licencia de armas estará exenta del pago por el depósito de las armas en el Depósito de Armas y Municiones del Negociado de la Policía de Puerto Rico. De resultar la acción judicial en una de culpabilidad final y firme, el Comisionado revocará la licencia permanentemente. Como parte de la pena a imponerse en aquellos casos donde las armas de fuego hayan sido utilizadas para la comisión de un delito, el Tribunal ordenará al Comisionado a que confisque las armas de fuego y municiones utilizadas y estas podrán ser vendidas por el Negociado de la Policía de Puerto Rico. Los fondos resultantes de esta venta serán remitidos al Fondo de Víctimas de Delito. El dueño de armas de fuego cuya licencia haya sido revocada por orden de un Tribunal de manera final y firme, retendrá la titularidad de las armas de fuego no utilizadas en la comisión de delito alguno, para vender, traspasar o ceder la titularidad de estas a otra persona con licencia de armas vigente, dentro de un término improrrogable de veinte (20) días a partir de la revocación de la licencia de armas, realizando el trámite correspondiente en la Oficina de Licencia de Armas, salvo que los delitos por los cuales ha sido convicto impliquen violencia o intimidación. De lo contrario, el Comisionado procederá con la confiscación de las armas de fuego y las municiones conforme a derecho.

404-2000. Según consta en la Exposición de Motivos de la Ley de Armas vigente, el propósito para la radicación y aprobación de la misma es reconocer el derecho fundamental de todo ciudadano a poseer y portar armas conforme a nuestra jurisdicción. No empece a que la Ley 404-2000 fue derogada, varias disposiciones guardan gran similitud con las establecidas en la Ley 168-2019, según enmendada. Podemos destacar entre estos el Artículo 2.13. Así pues, esta última disposición en la derogada Ley 404-2000 leía de la siguiente forma:

> **Artículo 2.13. — Motivos Fundados para Facultar a los Agentes del Orden Público a Ocupar Armas.**
>
> Cualquier agente del orden público ocupará la licencia, arma y municiones que posea un concesionario cuando tuviese motivos fundados para entender que el tenedor de la licencia hizo o hará uso ilegal de las armas y municiones, para causar daño a otras personas; por haber proferido amenazas de cometer un delito; por haber expresado su intención de suicidarse; cuando haya demostrado reiteradamente negligencia o descuido en el manejo del arma; cuando se estime que el tenedor padece de una condición mental, se le considere ebrio habitual o es adicto a sustancias controladas; o en cualquier otra situación de grave riesgo o peligro que justifique esta medida de emergencia. [...] 25 LPRA sec. 456l.

Nótese que, en esencia, tanto el Artículo 2.13 de la Ley 404-2000 y el de la Ley 168-2019 establecen lo mismo. Podría decirse que la Asamblea Legislativa transfirió, con algunas modificaciones gramaticales, el contenido de dicha disposición de una ley a otra. Ahora bien, evaluado el historial legislativo de la derogada Ley 404-2000, encontramos que, en el año 2002 se aprobó la Ley Núm. 27-2002, la cual enmendó un sinnúmero de artículos de la Ley 404-2000, entre estos, el Artículo 2.13. Cabe destacar que ambos Cuerpos Legislativos rindieron informes positivos a las enmiendas presentadas en sus respectivas Comisiones de lo Jurídico y esbozaron en su informe el siguiente lenguaje:

> 11. *Artículo 2.13-* Se enmienda este Artículo para aclarar que cualquier agente del orden público (como definido en la Ley) podrá ocupar un arma cuando tuviese motivos fundados para entender que la misma será usada ilegalmente. **La enmienda propuesta adopta estatutariamente la norma**

**sostenida por nuestro Tribunal Supremo** en *Pueblo v. Del Río*, 113 D.P.R. 684 (1982) a los efectos de que:

[Cuando un agente del orden público] observa a un ciudadano portar sobre su persona en la vía pública lo que es, o aparenta ser a simple vista un arma de fuego, entran en juego las disposiciones de la Regla 11 de las de Procedimiento Criminal, por cuanto al agente tiene 'motivos fundados' para creer que la persona que porta el arma de fuego ha cometido o está cometiendo un delito grave, independientemente de que así sea o no. En consecuencia, **el agente del orden público tiene el derecho y el deber de intervenir, arrestar el ciudadano que así actúa y ocupar el arma de fuego en cuestión** hasta que le sea demostrado en forma satisfactoria que el ciudadano estaba autorizado para portarla. Resolver lo contrario, a nuestro juicio, sería funesto para Puerto Rico; aparte de que la actuación de los agentes del orden público a esos efectos ni molestará ni incomodará ni le causará problemas al ciudadano decente y obediente de la ley, sólo al delincuente (Énfasis suplido).[17]

Es de observarse que el legislador dispuso claramente que la facultad es para **ocupar el arma en cuestión**. Por tanto, se refiere al arma que está en la **posesión inmediata** de la persona intervenida. Esta conclusión surge del propio párrafo previamente citado el cual hace alusión a que un agente, cuando tuviera los motivos fundados para creer que se está haciendo uso ilegal de un arma, intervendrá con la persona y le ocupará la misma. Claro está, es imperativo resaltar que *Pueblo v. Del Rio*, 113 DPR 684 (1982) ha recibido un trato negativo por parte del Tribunal Supremo de Puerto Rico. Ello, ya que dicho caso partía de la premisa que la portación de armas en Puerto Rico era un privilegio y no un derecho.[18]

No empece a lo anterior, no puede obviarse la intención legislativa que, si bien un ciudadano puede tener una licencia para portar un arma, en aquellos casos en que hubiera motivos fundados

---

[17] Véase, Informe de la Comisión de lo Jurídico de la Cámara de Representantes, P. de la C. 930, 7 de noviembre de 2001, 2da Sesión Ordinaria, 14. a Asamblea Legislativa, pág. 8; Informe de la Comisión de lo Jurídico del Senado de Puerto Rico, P. de la C. 930,11 de diciembre de 2001, 2da Sesión Ordinaria, 14. a Asamblea Legislativa, pág. 8.

[18] En concreto, el Tribunal Supremo de Puerto Rico manifestó:

Luego del pronunciamiento del Tribunal Supremo federal en *McDonald v. City of Chicago, III*, supra, es inescapable concluir que la posesión y portación de armas por parte de un ciudadano americano residente en Puerto Rico es un derecho fundamental —que el gobierno puertorriqueño tiene que respetar— y no un privilegio.

*Pueblo v. Colon González*, 209 DPR 967, 981–82, (2022).

por parte de un agente de orden público de que esa arma legal se está usando de manera ilegal, o cuando se arreste al tenedor de la misma por la comisión de un delito grave o delito menos grave que implique intimidación o violencia, el agente tendrá la facultad de intervenir y ocupar el arma en cuestión. Como mencionamos, la Asamblea Legislativa no alteró significativamente el leguaje del Artículo 2.13 de Ley 404-2000 cuando incorporó dicho artículo a la actual Ley de Armas, Ley 168-2019, según enmendada.

Por tanto, a tenor con el análisis previamente discutido, concluimos que el agente Cintrón tampoco tenía derecho a estar en la residencia del Recurrido bajo el fundamento de que el Artículo 2.13 de la Ley de Armas, *supra*, le daba autorización a realizar una ocupación sin orden en la residencia de la señora Cotto y el Recurrido. **Colegimos que la ocupación que faculta el Artículo 2.13 de la Ley de Armas, es aquella que está en la inmediata presencia de la persona intervenida**. A la luz de lo antes expuesto, el Peticionario no demostró que el agente Cintrón tenía derecho a estar en la residencia de la señora Cotto y el Recurrido, específicamente en el balcón, lugar donde alega percibió la evidencia incautada a plena vista. Por tanto, al no contar el agente Cintrón con autorización para estar en la residencia de la señora Cotto y el Recurrido al amparo del Artículo 2.13 de la Ley de Armas vigente, y al no haberse rebatido por el Estado la presunción de ilegalidad cuando se lleva a cabo un registro sin orden, y más aún, cuando el foro primario no le confirió credibilidad al testimonio vertido por el agente Cintrón en la vista de supresión de evidencia, determinamos que no se configuró la excepción que permite que se efectúe un registro sin orden de allanamiento. En consecuencia, concluimos que los primeros dos señalamientos de error no se cometieron.

Resuelto lo anterior, nos resta atender el planteamiento esgrimido por el Estado en su tercer señalamiento de error, en

cuanto la incorporación de la doctrina de buena fe federal a los casos de registro y allanamiento en nuestra jurisdicción. Nótese que nuestra Más Alta Curia aún no se ha expresado en torno a la aplicación a nuestra jurisdicción de la doctrina establecida en *Heien v. North Carolina, supra.* Esencialmente, el aludido caso resolvió que la ocupación de material ilegal a consecuencia de un error en la interpretación de una ley por parte de un policía no es fundamento suficiente para la supresión de la evidencia incautada, siempre y cuando responda a un error razonable y haya mediado buena fe. Y es que tal y como señalamos, el elemento primordial que se debe tomar en consideración a la hora de aplicar esta norma es, si el error cometido por el agente fue razonable. *Heien v. North Carolina, supra,* pág. 57. Indistintamente de lo anterior, cabe distinguir que **la opinión mayoritaria de dicho caso ha recibido un trato negativo y no ha sido incorporada por varios estados en parte porque no se desprende claramente del dictamen en que consiste dicha razonabilidad del error.**[19]

En el caso de marras, tras un detenido examen del expediente, podemos determinar que el planteamiento formulado por el Estado de que erró el foro primario al excluir la evidencia ocupada y no haberse considerado la doctrina federal de buena fe reafirmada por el Supremo federal en *Heien v North Carolina, supra,* no fue presentado ante el foro *a quo*.

---

[19] La opinión concurrente de la Jueza Kagan intenta brindar una posible guía en cuanto a lo que es razonable o no. Véase, *Heien v. North Carolina, supra,* pág. 68-71. Por su parte, la disidente de la jueza Sotomayor es crítica en cuanto la falta de claridad de la opinión mayoritaria concluyendo su ponencia de esta manera: "*I fear the Court's unwillingness to sketch a fuller view of what makes a mistake of law reasonable only presages the likely difficulty that courts will have applying the Court's decision in this case.*" *Íd.*, pág. 79.
Por otra parte, existen un sinnúmero de artículos académicos de distintas facultades de derecho que abordan esta problemática. A modo de ejemplo, véase, Harvard Law Review, *Search and Seizure--Reasonable Mistake of Law-- Heien v. North Carolina,* 129 Harv. L. Rev. 251, 258 (2015); K. Kinports, *Heien's Mistake of Law.* 68 Ala. L. Rev. 121, 157 (2016); K. McDonald Henning, *Reasonable" Police Mistakes: Fourth Amendment Claims and The "Good Faith" Exception After Heien,* 90 St. John's L. Rev. 271, 301 (2016).

No empece a ello, podría argumentarse que, por tratarse el error esbozado sobre la aplicación de una doctrina de derecho, esta *Curia* tiene facultad para entender en la misma. No obstante, lo anterior, para que pueda determinarse si hubo o no un error razonable por parte del agente Cintrón y si medió buena fe, era necesario que se ventilara la controversia ante el foro primario y se realizara una determinación de hechos a esos fines. Asunto que no ocurrió. Por tanto, el Estado debió argumentar ante el foro primario que, en la alternativa, procedía la admisión de la evidencia incautada, sin orden judicial, porque el agente Cintrón creía razonablemente y de buena fe que la Ley de Armas, le permitía tal actuación. Así las cosas, lo antes expuesto implica que el tercer error esbozado por el Peticionario fue traído a destiempo y que no existe determinaciones de hecho alguna por el foro primario en torno a la razonabilidad y si medió o no buena fe por parte del agente Cintrón.

Por tanto, este Panel determina que el Peticionario no puso en posición a esta *Curia* para poder entender en el tercer error esbozado.

**IV.**

Por los fundamentos antes expuestos, **expedimos** el auto de *certiorari* y **confirmamos** el dictamen recurrido.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones